THE CENTRAL RAILROAD AND BANKING COMPANY, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

THE SOUTHWESTERN RAILROAD COMPANY, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

THE STATE OF GEORGIA, plaintiff in error, vs. THE AUGUSTA AND SAVANNAH RAILROAD COMPANY, defendant in error.

1. The act of the 24th of August, 1872, under which the Central Railroad and Banking Company and the Macon and Western Railroad Company were consolidated under the name and charter of the former company, created a new corporation for the specific purposes therein declared, and as no time was specified in the act for its continuance, it would not expire, under the general law of the state, for thirty years.

2. The fact that all the rights, privileges, etc., of the Central Railroad and Banking Company, as specified in its charter of 1835, were conferred upon the new company by general reference thereto in the act of August, 1872, does not cause such grant to operate as if made in the former year.    The legal effect is the same as if such rights, etc., had been specifically enumerated in the latter act, and the right of withdrawal was therefore reserved to the state under the 1682d section of the Code, in view of the provisions of which said new charter was accepted.

3. By act of 1856, the union and consolidation of the Southwestern and the Muscogee Railroad Companies, under the name and charter of the former company, was authorized. The 5th section provided that such act should not become operative until accepted by the stockholders. This acceptance, and the consolidation, took place in 1868:

*Held,* that the contract between the state and such new company was not consummated until 1868, and was therefore entered into in view of the provisions of the 1682d section of the Code, reserving to the state the right to withdraw the franchise.

4. The Augusta and Savannah Railroad Company, standing upon its original charter as it was granted and *accepted* prior to the adoption of the Code of 1863, the state could not, by the act of 1874, withdraw any of the franchises granted to that company, without impairing the obligation of her contract with it, she not having reserved the right to do so when the contract was made. The 1682d section of the Code of 1863, not being a part of the public law of the state at that time, did not enter into and constitute a part of the contract between the state and that company.

Constitutional law. Corporations. Charters. Contracts. Laws. Taxes. Before Judge HOPKINS. Fulton Superior Court. October Term, 1874.

For the facts of this case, see the opinions.

JACKSON, LAWTON & BASINGER; LYON & JACKSON; JACKSON & CLARKE, for the railroad companies.

N. J. HAMMOND, attorney general; R. TOOMBS, for the state.

WARNER, Chief Justice.

On the 28th of February, 1874, the general assembly of the state of Georgia passed an act to amend the tax laws of the state, so far as the same related to railroad companies, and to define the liability of such companies to taxation, and to repeal so much of the charters of such companies, respectively, as might conflict with the provisions of that act. The act requires the presidents of all the railroad companies in the state to return, on oath, annually, to the comptroller general, the value of the property of their respective companies, without deducting their indebtedness, to be taxed as other prop-

The Central Railroad and Banking Company *vs.* The State of Georgia.

erty of the people of the state, and provides for the collection of the same. The 4th section of the act repeals all conflicting laws. In accordance with the provisions of the above recited act, the comptroller general of the state issued executions against the Central Railroad and Banking Company of Georgia, the Southwestern Railroad Company, and the Augusta and Savannah Railroad Company, for the collection of the tax claimed to be due to the state by each company respectively. The companies filed affidavits of illegality to the executions, as provided by the act of 1874, and on the hearing thereof in the court below, the court overruled the grounds taken in the affidavits of illegality by the Central Railroad and Banking Company and the Southwestern Railroad Company, whereupon the defendants excepted, and allege the same as error. The court sustained the affidavit of illegality made by the Augusta and Savannah Railroad Company, whereupon the state excepted, and assigned the same as error. The three cases were argued together here.

1. It is insisted by the plaintiffs in error in the two first cases that the act of 1874 is unconstitituonal and void, because it impairs the obligation of the contract made by the respective companies with the state under the respective charters thereof, within the true intent and meaning of the 10th section of the 1st article of the constitution of the United States. By the original charter of the Central Railroad and Banking Company; granted to it in 1835, it is provided, "that said railroad and the appurtenances of the same, shall not be subjected to be taxed higher than one-half of one per centum upon its annual net income."

By the original charter of the Southwestern Railroad Company, granted to it in 1845, it is provided, "that the said railway and its appurtenances, and all property therewith connected, shall not be subject to be taxed higher than one-half of one per cent. upon its annual net income." If the defendants are now before the court, under the original charters as granted by the state, and as then accepted by each company, that would have been an executed contract between the state

and the respective companies, and the state, as the law then stood, could not have impaired the obligation thereof by the passage of the act of 1874. But do the defendants now stand before the court as they would have stood under the law as it existed at the time of the granting and acceptance of the original charters? Have the two companies *accepted* new charters under grants from the state, under a new and different law than that which existed in the state, at the time the original charters were granted and accepted? If the two companies have obtained new charters and new grants from the state since the enactment of such new law, and *accepted* the same, then that new law of the state, entered into and formed an essential element of the contract between the state and the two companies. By the general law of this state, as declared on the 1st of January, 1863, (that being the time the Code took effect as the law of the state,) corporations are either public or private." "A public corporation is one having for its object the administration of a portion of the powers of government delegated to it for that purpose; such are municipal corporations." "All others are private, whether the object of incorporation be for public convenience or individual profit, and whether the purpose be in its nature civil, religious or educational." "In all cases of *private* charters hereafter granted the state reserves the right to withdraw the franchise, unless such right is *expressly negatived* in the charter." "Private corporations heretofore created without the reservation of the right of *dissolution*, and where individual rights have become vested, are not subject to dissolution at the will of the state:" Code, sections 1671, 1672, 1673, 1682, 1683. "Should any charter, granted in future by the general assembly, to a private corporation, be silent as to its continuance, such charter shall expire at the end of thirty years from the date of its grant:" Code, section 1678. In the case of *The West End and Atlanta Street Railroad Company vs. The Atlanta Street Railroad Company*, 49 *Georgia Reports*, 151, this court, in giving an interpretation to the 1682d section of the Code, held that the power reserved by the state to withdraw the entire fran-

chise, necessarily included the power to modify or restrict the exercise of it. This court also held, in that case, that this section of the Code introduced a new element into the law of private corporations in this state, and that all charters granted by the state to *private* corporations, since its adoption, are subject to its provisions, and that the acceptance by the company of the grant made by the general assembly, must be understood as having been done with a full knowledge of this general law, as much so as if it had been inserted in the act of incorporation, for it is a well-established rule that the laws which exist at the time and place of the making of a contract, applicable thereto, enter into and form a part of it. In August, 1872, the general assembly of the state passed an act to authorize and provide for the union and consolidation of the Macon and Western Railroad Company with the Central Railroad and Banking Company of Georgia, under the name and charter of the latter company. By this act the two companies were authorized and empowered to unite and consolidate the stocks of the said two companies, and all the rights, privileges, immunities, property and franchises belonging or attaching to said companies, under the name and charter of the said Central Railroad and Banking Company of Georgia, in such manner that each and every owner and holder of shares of the capital stock of the Macon and Western Railroad Company shall be entitled to and receive an equal number of shares of the capital stock of *the consolidated company.* The act further provides that neither company should be discharged from any contract previously entered into, but all such contracts shall be assumed by and be binding on the Central Railroad and Banking Company of Georgia, and all benefits and rights under the same shall accrue to and vest in the said last mentioned company, and that the capital stock of the Central Railroad and Banking Company of Georgia shall not exceed the amount of the authorized capital thereof, and the present authorized capital of the Macon and Western Railroad Company added thereto. The 2d section of the act provides for the assent of the stockholders of each company

to the consolidation. The 3d section provides for notification to the governor of the consolidation of the two companies, under the act. The 4th section provides that each stockholder in the Macon and Western Railroad Company shall be entitled to receive a certificate of stock as a shareholder in the Central Railroad and Banking Company of Georgia for a like number of shares, upon the surrender of his certificate of stock in the former company, which new certificate shall entitle the holder thereof to the same rights, privileges and benefits as attach to the holders of stock now held by the shareholders in said companies, or either of them. The 5th section repeals all conflicting laws. Was this an act of incorporation as defined by the common law and by our own Code? A corporation, as defined by the ancient common law, is a franchise created by the king, and is a body constituted by policy, with a capacity to take or to do: 4 Comyn's Digest, top page, 465, title, Corporation. There need not be any precise words to make a corporation. Anciently, if the king had granted to a *vill gildam mercatoriam*, it was, by such grant, incorporated: 4 Comyn's Digest, top page, 470; see, also, 2 Kent's Com., 307; Denton *vs.* Jackson, 2 John. Ch. Reports, 324. One corporation may be made out of another corporation: 6 Viner's Ab., 260. A corporation, as defined by our Code, is an artificial person created by law for specific purposes, the limit of whose existence, powers and liabilities is fixed by the act of incorporation, usually called its charter: Code, sec. 1670.

2. The *specific purposes* for which this charter was granted by the state is manifested by the terms of the charter. The state created by law this corporation, and granted to it the right and privilege to unite and consolidate the stocks of the two companies, and all the rights, privileges, immunities, property and franchises belonging or attaching to said companies under the name and charter of the said Central Railroad and Banking Company of Georgia, in such manner as is specified therein. In other words, the state granted to this corporation all the rights, privileges, etc., which belonged to either company, under the name and charter of the Central

The Central Railroad and Banking Company *vs.* The State of Georgia.

Railroad and Banking Company, and the new consolidated company was to have the same rights, privileges and immunities as the Central Railroad and Banking Company had under its charter. Instead of specifying in the new act of consolidation what the rights, privileges and immunities of the Central Railroad and Banking Company were, reference must now be had to its original charter to ascertain them. The fact that the consolidation act of incorporation confers upon the new company the same rights, privileges and immunities as were conferred upon the Central Railroad and Banking Company, has no more legal significance than if the words of its original charter had been incorporated into the new consolidation act. Under the new consolidation act of incorporation the company has conferred upon it, by the grant from the state, all the rights, privileges and immunities which were conferred by the original charter of the Central Railroad and Banking Company, and in order to ascertain what those rights, privileges and immunities are, we must look to that original charter, inasmuch as the same are not specified in the new consolidation act of incorporation, but that does not prove that the act of August, 1872, was not a legal act of incorporation by the general assembly of the state. There are many acts of incorporation in this state which refer to the charters of other incorporated companies as to the powers, privileges, immunities and franchises granted by the general assembly, but it has never been doubted that such acts were valid acts of incorporation. The contract between the state and the Central Railroad and Banking Company, under the act of August, 1872, is not the same contract as that made with it by the state in 1835. That company acquired new rights and other privileges under the act of 1872, in *addition* to those granted to it in 1835. It is true, that in addition to the rights and privileges granted by the act of 1872, the general assembly also granted to the new company, by that act, all the rights, privileges, immunities, property and franchises belonging or attaching to the Central Railroad and Banking Company, as specified in its charter of

1835, but the acceptance of the grants contained in the act of 1872 by the company was a new contract with the state. There was a new consideration obtained by the company, under the charter of 1872, which did not exist under the charter of 1835, and there was a new party introduced by the charter of 1872 and consolidated with the company, to-wit: the Macon and Western Railroad Company; and the *acceptance* of the charter of 1872 by the company, upon a new consideration, and with a new party consolidated into the company, was such a *novation* of the original contract, under the old charter, as put an end to it, and created a new company under the charter of 1872, which, under the general law of the state, will not expire until thirty years from the date of the charter: See Code, section 2724, as to *novation* of contracts. If, however, the general assembly of the state, by the act of 1872, had done nothing more than simply renewed the charter of the company, granted to it in 1835, with all its rights, privileges, immunities and franchises, as therein specified, and the company had *accepted* the same, would it not have been accepted in view of the general law of the state as declared by the Code of 1863? But the act of 1872 does much more than that, as will readily be perceived by referring to its provisions. The main point in the case is, whether the grant of exemption from taxation, as specified in the charter of 1835, and referred to in the act of 1872 as one of the privileges and immunities granted to the company, is such an executed contract between the state and the company, the obligation of which the state cannot impair by withdrawing the franchise granted. By the general law of the state, at the time the charter of August, 1872, was granted by the general assembly, consolidating the two companies, and at the time of its *acceptance*, the state had reserved the right, by her public law, to withdraw the franchise granted, unless such right to withdraw had been *expressly negatived* in the charter. The 4th section of the Code declares, that in the construction of all statutory enactments of this state, the ordinary signification shall be applied to all words, except words of art, etc.

The ordinary signification of the word "franchise," as defined by Webster, is "a particular privilege or right granted by a prince or sovereign to an individual, or to a number of persons; an exemption from a burden or duty to which others are subject." In a legal sense, franchise and liberty are used as synonymous terms, and the kinds of them are various and almost infinite: 2 Bl. Com., 37. To "withdraw" is to take away what has been enjoyed; to take from. It may be conceded that the company, under its charter of 1872, had as one of its franchises, granted to it by the state, the right to be exempted from the payment of a higher tax than one-half of one per cent. upon its annual net income; still, the state reserved the right (whether wisely or unwisely, is not a question for the courts to decide) to withdraw that franchise whenever, in her judgment, the public interest required it, without impairing the obligation of her contract with the company, as prohibited by the constitution, for the reason that the company *accepted* the grant upon that condition; that was a part of the contract between the state and the company when it accepted the grant: *West End and Atlanta Street Railroad Company vs. The Atlanta Street Railroad Company*, 49 *Georgia Reports*, 151. The supreme court of the United States fully recognized these general principles in Tomlinson *vs.* Jessup, 15 Wallace's Reports, 454; Miller *vs.* The State, *Ibid.*, 478; Holyoke Company *vs.* Lyman, *Ibid.*, 500. In the case of Tomlinson *vs.* Branch, *Ibid.*, 460, which was cited by the plaintiff in error, it was held by the court; in that case, that the act of the South Carolina legislature of 1843, authorizing the consolidation of two railroad companies, withdrew the charter from the operation of the 41st section of the act of 1841, of that state, providing for the repeal or modification of charters granted by the state; and therefore, that case does not contravene the rulings of that court in the other cases cited. This charter of the company would have continued for thirty years from the date of its grant, and the right of the state to withdraw any of the franchises granted by it to the company, is not *expressly negatived* in it. The reasons why the state did

not *negative* her right to withdraw any of the franchises grant-
ed, do not appear. The general assembly may have thought
that inasmuch as the Central Railroad and Banking Company
had enjoyed the exemption from taxation at a higher rate than
one-half of one per cent. upon its net annual income for many
years, and being then abundantly able to take care of itself,
and by the consolidation of another company with it, thereby
increasing its power and strength in the state for thirty years,
that her interest required that she should reserve to herself
the right to withdraw at least one of the franchises granted
whenever, in her judgment, the public interest should demand
it. Whatever may have been the reasons which ᐟoperated on
the mind of the legislature for reserving this right of the state
in making the grant, is not now a question for the courts
to determine. Although the state did reserve the right, in
making the grant, to withdraw the franchise, it is not to be
presumed that she would exercise that right captiously or un-
justly, and it is not apparent that she has done so. The state
has only ᐧexercised her sovereign power of taxation by taxing
the property of the company as the property of the whole
people of the state is taxed, and not otherwise, and cannot tax
it otherwise under the provisions of the state constitution, if
she was disposed to do so.

It was insisted on the argument for the plaintiffs in error,
that inasmuch as this court had decided in the case of the
*Mechanics' Bank vs. Heard,* 37 *Georgia Reports,* 401, that a
corporation could not voluntarily surrender its franchises to
the state without the assent of the legislature, that it might
be compelled to continue after its most valuable franchises
had been withdrawn. The charter in that case was granted
prior to the adoption of the Code of 1863. This court never
has decided, and perhaps never will decide, that when the
state withdraws any of the franchises granted to a corpora-
tion since the adoption of the Code, that such corporation,
cannot *voluntarily* surrender its franchises to the state, as
provided by the 1686th section thereof.

3. The Southwestern Railroad Company occupies a differ-

ent position, in one respect, from that of the Central Railroad and Banking Company. It appears from the evidence in the record, that the act providing for the union and consolidation of the Muscogee Railroad Company with the Southwestern Railroad Company, under the charter of the latter company, was passed in 1856, the 5th section of which declared that the act should not go into operation until there should be a vote of a majority of two-thirds of the stockholders of each company in favor of the union and consolidation, and of the provisions of the act, which was not done until 1868, and the consolidation of the two roads did not take place until November, 1868. The act authorizing the consolidation of the two roads was not *accepted* by the stockholders thereof until 1868, and did not become a *contract* between the state and the Southwestern Railroad Company until that time, which was subsequent to the adoption of the Code in 1863. The contract was therefore consummated, in view of the public law of the state as it existed at that time, and the exercise of the taxing power of the state, as provided by the act of February, 1874, did not impair the obligation of that contract, as prohibited by the constitution of the United States. What has been said in relation to the act consolidating the Macon and Western Railroad Company with the Central Railroad and Banking Company, is also applicable to the act consolidating the Muscogee Railroad Company with the Southwestern Railroad Company.

4. The Augusta and Savannah Railroad Company was chartered by the general assembly of the state, in 1838, before the adoption of the Code of 1863. By the 13th section of its charter it is provided "that said railroad, and the property of said company, shall not be subject to be taxed higher than one-half of one per cent. on its annual income." The defendant alleged in its affidavit of illegality to the execution issued against it by the state, reciting the exemption in its charter, that the act of 1874, under the provisions of which the execution against its property was issued, was unconstitutional and void, because it impaired the obligation of its con-

tract made with the state, on the statement of facts contained in the record. The counsel for the state demurred generally to the defendant's affidavit of illegality, which demurrer was overruled by the court, and the affidavit of illegality sustained.

When the state made the grant to the defendant, contained in its charter, and the same was *accepted*, it became an executed contract between the state and the defendant, which the state, under the law as it then existed, could not impair its obligation by withdrawing the franchise granted, as she attempted to do, by the passage of the act of 1874; and so far as said act was applicable to the defendant's franchise, as specified in the grant, exempting its railroad and property from a higher rate of taxation than one-half of one per cent., it did impair the obligation of the contract, and as to that contract, was unconstitutional and void, the state not having reserved the right to withdraw the franchise granted, at the time the grant was *accepted* by the company.

After a careful examination of the questions made in the record, the conclusion is, first, that the act of the 24th of August, 1872, consolidating the two railroad companies under the name and charter of the Central Railroad and Banking Company of Georgia, created a new corporation, for the specific purposes, as therein declared, and as no time was specified in the act for its continuance, it would not expire, under the general law of the state, until the end of thirty years from the date of the act. Second, the fact that all the rights, privileges, immunities and franchises of the Central Railroad and Banking Company, as specified in its old charter, were conferred by the act of 1872 upon the new company, those rights, privileges, immunities and franchises, were granted by the act to the new company in the same manner, and had the same legal effect, as if the same had been specifically enumerated in the body of the new act, and when accepted by the company, were accepted in view of the provisions of the 1682d section of the Code, and therefore the state reserved the right to withdraw the franchise as to the exemption from taxation,

as she has done; and such withdrawal did not impair the obligation of her contract with the company as prohibited by the constitution of the United States, and the same principles are applicable to the Southwestern Railroad Company. Third, the Augusta and Savannah Railroad Company, standing upon its original charter as it was granted and *accepted* prior to the adoption of the Code in 1863, the state could not, by the act of 1874, withdraw any of the franchises granted to that company, without impairing the obligation of her contract with it, she not having reserved the right to do so when the contract was made. The 1682d section of the Code of 1863, not being a part of the public law of the state at that time, did not enter into and constitute any part of the contract between the state and that company.

Let the judgment of the court below, in the three cases mentioned in this opinion, be affirmed.

McCAY, Judge, concurring.

1st. Assuming that under the original charters of these companies, the Central Railroad and the Southwestern Railroad, they were exempt from taxation at a higher rate than one-half of one per cent. on the net income of each, and that it was not competent for the legislature to take away that privilege, it is my judgment that under the several acts providing for the consolidation of the Central Railroad Company and the Macon and Western and the Southwestern and Muscogee Railroads, two new corporations were created, and that these new companies, whilst they had the same exemption, yet they each held it subject to be withdrawn, as declared in section 1682 of the Code. That section is in these words: "In all cases of private charters hereafter granted, the state reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter." It is not denied that these companies had, after the consolidation, every right granted in their original charters. The point made against them and upon which the state of Georgia rests her right is, that after the consolidation, they held these rights, not by virtue of the

old charter, but by virtue of and under the consolidating acts, and so holding them, that they only hold them at the will of the state.    That holding them under a grant of a date subsequent to first of January, 1863, (when the Code went into effect,) the legislature may repeal that law and take away that grant.

It is claimed on the part of the state that the necessary legal and inevitable effect of the consolidating act, and the acceptance of it by the two corporations, was, in each case, a surrender by the companies to the state of their old charters and the acceptance of a new charter, and that this new charter, though it re-granted all the rights, privileges and immunities of each of the old charters to the consolidated company, is, as it is of a date subsequent to the Code, subject to the provisions of section 1682 of that Code.    Whether this be so is the great question we have to determine.

Do these companies hold their franchises under their original charters, or do they hold them under the consolidating acts?    If their tenure be under the consolidating acts, the state has a right of repeal; if under their charters, the state has not.    It occurs to me that the decision of this question turns very materially on the meaning of the word consolidation, as applied to two or more corporations.    Such an application of the word is not only new but seems to be confined to the United States.    In England they use the word amalgamation to express something of the same idea, though even that word, as used in England, does not seem to have any certain and defined meaning.    It may mean a mere sale of the assets and business of one company to another, or it may mean the abandonment by two companies of their respective articles and the formation of a new one, composed of the members of the two old ones.    Dr. Brice, in his book on *Ultra Vires,* commences his chapter on amalgamation of railroads by a discussion of the civil law doctrine of novation, as when A owes B, and B. owes C, and there is a novation of the contract, so as that A becomes the debtor of C, and the debt from A to B, as well as the debt from B to C, becomes

ATLANTA, JANUARY TERM, 1875.     415

The Central Railroad and Banking Company *vs.* The State of Georgia.

extinct: See Brice's *Ultra Vires*, 509, and note. The act of 1833 and 1834, Vic., c. 61, seems to treat "amalgamation" and "transfer of business" as distinct. The latter case is treated as a purchase, the former as a combination. In this country I have not been able to find a case where the word amalgamation is used. Here the word consolidation is common; but so far as I have been able to find, it is only used in cases where there is a complete merger of two companies. In McMahon *vs.* Morrison, 16 Indiana, 172; Laurence *vs.* Lebanon Railroad Company, 30 Penn. St., 42; and in Pausel *vs.* Northern Mississippi Railroad Company, 42 Miss., 63, this term consolidation is defined "a dissolution of the old corporations," and at the same instant the creation of a new, with property, liabilities and stockholders derived from those thus passing out of existence. The language of the act of August 24, 1872, is that the companies shall be consolidated, united, "that the Macon and Western Railroad Company and the Central Railroad and Banking Company of Georgia be, and they are hereby authorized and empowered to unite and consolidate the stock of the said two companies, and all the rights, privileges, immunities, property and franchises belonging or attaching to said companies under the name and charter of the said the Central Railroad and Banking Company of Georgia, in such a manner as that each and every owner and holder of shares of capital stock of the Macon and Western Railroad Company shall be entitled to and receive an equal number of shares of the consolidated company."

*Both companies* are empowered "to consolidate" and form a union. Care is taken that the debts of *both* the organizations shall become the debts of the new. The stock to be issued to the Macon and Western stockholders is to be stock in the consolidated company. This language is entirely inconsistent with the idea insisted upon by the plaintiffs in error, to-wit: that the act merely intended to allow a purchase by the Central Railroad Company of the Macon and Western. Why call the company the consolidated company? Why provide, as is done in section 2, for official action by

both companies, either in a shareholders' meeting or by written authority to the directors? Why take pains to carry over to the new company the debts of both the old ones? It is impossible to conceive of *consolidation* if this be not one. The act itself calls it so. The two companies do, in fact, become one. There is, it is true, no express provision that the old companies cease to exist, but that is the necessary effect of the arrangement. Nobody pretends that the Macon and Western Company is in existence, but there is no express language of the act so declaring. It has ceased to exist, simply because all its stock, franchises, debts, and rights, are absorbed in the *consolidated company*. Why is not this just as true of the old Central Railroad Company? Had a new name been taken, nobody would for a moment have supposed that the old Central Railroad Company did not go out of existence precisely as did the Macon and Western. The stockholders of both are equal stockholders in the new company—the consolidated company—all the debts of *both* are to be assumed by and be binding on the consolidated company, and all benefits and rights of both are to accrue to and vest in the same. Why this singular language, why should care be taken to carry over to the consolidated company the debts and liabilities of both the Central and Southwestern companies as well as the rights and benefits? There is, too, something in section 3d which to my mind adds force to these ideas. That section provides that when the assent of the stockholders shall be had, the directors of both corporations shall " complete said union and consolidation, and certify the same to his excellency the governor of this state, to be filed in the office of the secretary of state." Why this formal provision for having this " union and consolidation " part of the public records? Such a proceeding fits aptly with the idea of a surrender of the old charters and the acceptance of the new. Just such a thing would have been provided had such surrender and acceptance been the intent of the legislature. I doubt if in all the "amendments," however important, that have been passed to the charters of corporations in this state, the acceptance of

the amendment has been required to be so formally made. Indeed, to take this act altogether, it would be very difficult to use language more apt to merge, amalgamate, consolidate, both of these original corporations, into a *new one*, and entirely to abandon the old companies. Take the words of the 4th section, especially the last clause, defining the rights of the Macon and Western shareholders. It says: "which new certificate shall entitle the holder thereof to the same rights, privileges and benefits, as attach to holders of stock now (at the date of the act and before the union,) held by the shareholders in said *companies* or *either of them*. By the very terms over and over again repeated, the stockholders of both of these companies, become stockholders in the road from Savannah to Atlanta. Each stockholder of each company keeps all his old rights, powers, and privileges as to the road of his old company, and gets new rights in the consolidated company.

As to the debts of both the old companies, there is a clear novation by the express terms of the act; the consolidated company undertakes to pay all the debts and liabilities of *both* of the old companies, and upon all *contracts* where rights accrue to either of the old companies the consolidated company is to have the benefit of them. The Macon and Western Railroad Company has ceased to exist, simply because its property and franchises, its debts and liabilities, are transferred to the *consolidated company;* and precisely the same thing is true of the old Central Railroad and Banking. Company, for by the express terms of the act, its rights, privileges, immunities, property and franchises, its debts and liabilities, and all benefits and rights arising under any of its contracts, are transferred to the *consolidated company.*

As I have said, it is significant that the act itself, not only transfers the debts, liabilities, rights and benefits, etc., of *both companies* over but does it to the consolidated company. So that this act not only authorizes the consolidation of the two companies, which *ipso facto*, according to the authorities, and to the actual meaning of the word, involves the surrender of

both the old charters and the acceptance of a new one. But the details of the act—the words used—show that this was the clear contemplation of the legislature in passing the bill and granting the authority. The 15th section of the act of parliament of 1870, in reference to life insurance companies, has an expression in it that exactly conveys the idea I intend to express. The expression is this: When an amalgamation takes place between two companies, or when the business of one company is transferred to another, *the combined company, or the purchasing company* shall, etc. Was the union of the two companies, the Central and the Macon and Western, a combination or a purchase? Were they *contractors*, by which one became bound to the other, or by which the Central Railroad Company undertook a duty to the stockholders of the Macon and Western? Clearly this latter was not the case. The assent of the legislature having been given, and the assent of the stockholders obtained, the directors of each company officially "consolidated," and under the corporate seals of each company certified that consolidation to the governor. It is not a sale, not a transfer of the Macon and Western to the Central, it is the mutual meeting, blending, union—consolidation of both in a new consolidated company. The Central loses its identity just as completely as the Macon and Western. The act of both is the same. On the filing of the certificate the stockholders of both the old companies, no longer stockholders in a road from Macon to Savannah or from Macon to Atlanta, are stockholders in a road from Savannah to Atlanta, stockholders in the consolidated company. There is not a word in the act authorizing the then Central Railroad and Banking Company to work a railroad from Macon to Atlanta. Its old charter is not amended, and that old company, if it still exists, is to-day exercising a franchise not granted to it by law.

The consolidated company has the right to work a road from Savannah to Atlanta, but it is not the Central Railroad and Banking Company, chartered in 1835; nor is it the Macon and Western Railroad Company, but it is the consolidated

The Central Railroad and Banking Company *vs.* The State of Georgia.

company formed under the act of August 24th, 1872, and clothed with the full franchise, on the filing of the certificate of its formation or consolidation with the governor, as prescribed by the act. A mere looker on, who sees the Central Railroad and Banking Company working the road from Macon to Atlanta, might suppose the charter had been amended, and the franchise extended. But we find no such extension in the act of August 24th, 1872. The Macon and Western Railroad is to-day working a road from Atlanta to Savannah, just as much as the old Central Railroad Company is. The truth is, neither is doing it. A new company, formed under the consolidating act and springing into existence on the transmission of the certificate of consolidation to his excellency, the governor, to be filed, as other acts of incorporation are, with the secretary of state; a consolidated company, taking for its name the Central Railroad and Banking Company, is the entity that is operating the two roads now consolidated into one.

2d. The doctrine is now well established by numerous decisions, that if the state, in granting a charter, reserve the right to repeal, the right exists without qualification. That is the bargain, and though there are decisions that this right has limitations, yet the current of authority is the other way. Perhaps, too, all the cases are reconcilable, by admitting that the repeal cannot affect rights between the corporations and third persons, arising under the charter. And this, it seems to me, is the logic and common sense of the matter. A bargain is a bargain. Those who enter upon the enterprise do so with their eyes open. I do not see how any limitation can exist, even if by the law of the state, as was the common law, the real estate goes to the state on the dissolution. I see no reason why the state has not a right to exercise the privilege reserved in the charter. As I have said, those who make the venture, accept and act upon the charter, do so at their own hazard; they take the risk like other people who undertake enterprises, the success of which turns upon the permanence of particular laws. So, too, it is well settled, that

when there is a general *law* declaring all charters granted after its passage, repealable, it is not a violation of the obligation of the contract between the state and a corporation to repeal a charter so granted.    The contract is entered into under the general law, reserving the right of repeal, and the adventurers take the charter with such a construction upon the grant.    A charter so granted stands on the same footing as though the right to repeal was reserved in the charter.    The law declaring the right of repeal is a rule of construction. An analogus case may be found in section 1688 of the Code, which declares that all charters expire at the end of thirty years, unless otherwise specially provided.    At common law, charters were perpetual.    Under the decision of the supreme court of the United States, in the Dartmouth College case, charters were held here, on this principle, to be perpetual and irrepealable.    But our legislature has repealed this common law rule, and declared charters not perpetual.

1st.  It limits them to thirty years, when they expire, without more..

2d.  It declares, as a rule of law, that the legislature may repeal them, and the contract, like all other contracts, is entered into under the general law.    As a matter of course, this being only a law, the legislature may alter it, and so the Code provides that all charters are repealable, unless it be expressly provided in any charter to the contrary; unless, in other words, the law is repealed so far as that charter is concerned.    It results, therefore, that in any state where this general law exists, any charter in which it is not expressly declared that it is irrepealable, is subject to the legislative will just as though it were specifically provided in the charter: 47 Maine, 34; 32 N. J. L., 134; 21 N. Y., 9; 55 Penn. St., 452; 3 Bush, Ky., 592.  See also Tomlinson *vs.* Jessup, 15th Wallace, 457; where the law is so distinctly held.

3d.  But it is said that whilst it may well be that the charter is repealable, it does not at all follow that it is competent to take away a part of it.    The right to destroy may exist, and yet the legislature has not a right to maim.    But does not

the right to repeal include the right to modify? Does not the greater include the less? Perhaps there might be strength in this position, if charters in this state stood as they do at common law. If it were competent for the state to compel a corporation to exercise its functions, perhaps it might well be said, that the state could not take away a part and insist on the corporation exercising what remains. But our Code, section 1685, authorizes a corporation to surrender its franchises. It was argued that the decision in the case of *The Mechanics' Bank vs. Heard*, 37 *Georgia*, 401, is contrary to this. But that charter was one granted before the Code, and was irrepealable. This court has not held that a corporation created since the Code may not surrender its franchises without the consent of the state. Indeed, such a right would seem to follow from the reservation of the right to repeal. A contract ought to be equal, and it was doubtless just because the right to repeal was reserved that the section authorizing a surrender was made a part of the system. If, then, the legislature has a right to withdraw the whole franchise, it is within its sphere to withdraw a part. If the stockholders do not desire to keep what is left they can surrender. But at best this objection is only a formal one. If the right to repeal exists the legislature may clearly, at its pleasure, enact that the charter shall be repealed, unless the corporation consent to pay taxes like other people, and practically this would, without doubt be the consequence were this case to turn solely on the point that this is not a repeal but only a modification.

But there is another section of the Code which is pertinent to this discussion. Section 1651 of the Code is as follows: "Persons are either real or artificial. The latter are the creatures of the law, and except so far as the law *forbids* it, subject to be changed, modified or destroyed."

Now, here is a clear declaration of the right to modify, change or destroy, unless the law forbids it. Evidently the codifiers had the very provisions found in sections 1682 and 1683, in mind. As to private charters granted before the Code, the law, to-wit: the constitution of the United States *forbid*

the repeal or modification. As to private charters granted since the Code, the legislature might forbid it by so expressly contracting in the charter. Both these provisions ought to be taken together. They were the product of one mind, at the same time, and by taking them together it seems to me that the law maker most surely used the word "withdraw" in section 1682, with the idea that it included the right expressly declared in section 1651, to change and modify as well as destroy.

The Southwestern Railroad Company stands on the same footing as the Central. In both cases the intent was not a purchase but a consolidation. This is the very language used, and this the effect of the thing done in both cases. In my judgment, and according to the authorities, this consolidation can only be done by the dissolution of both companies and the creation of a new, under such name, and charter as the act of consolidation requires. This is the legal, necessary effect of a consolidation. The authority to consolidate is a legislative authority to surrender the old and take up the new; and when the companies do consolidate, the old is surrendered and the new accepted. Nor is there anything in the point that the authority to consolidate was granted before the Code. The consolidation was after the adoption of the rule changing the common law presumption that charters are perpetual unless limited in terms. The act permitting the consolidation was not a charter until accepted. Until then it was subject, even under the old law, to repeal or modification at the will of the state. No right had vested, no contract had been entered into. It was a mere proposition. The sections of the Code to which I have referred modified this proposition. Under the offer, as the law stood, to-wit: the common law, there was no limit as to time, and under the constitution of the United States the charter, being thus unlimited, would have been irrepealable if accepted. But before the acceptance this common law was altered. There was a limit fixed of thirty years, and besides, it was provided, under the two sections of the Code to which I have alluded,

that a charter might be modified or withdrawn.   That the grant was nothing till accepted is well settled : Dartmouth College *vs.* Woodward, 4 Wheat., 518; State *vs.* Dawson, 16 Indiana, 40; Kennebec Bank *vs.* Richardson, 1 Greenleaf, 81.