WILMINGTON CITY RAILWAY COMPANY,

vs.

WILMINGTON AND BRANDYWINE SPRINGS RAILWAY COMPANY.

*New Castle, March T.* 1900.

The reserved power of revocation of corporate charters provided for in *art.* 2, *sec.* 17 of the Constitution of 1831, does not require that the power of revocation should be expressly reserved in the charter, as its object is effected by the Constitution without any aid from the legislative act.

The reservation of a power of revocation of the charters of corporations either in a constitution or general statute becomes part of every charter subsequently granted, as if expressed in the instrument itself.

Such reserved power of revocation must necessarily be exercised at the pleasure of the Legislature, which may exert that power at any time and for any reasons which seem sufficient to itself, or, in other words. at its pleasure.

The power of revocation reserved by the Constitution includes the power to take away any single power or franchise, separate or divisible from the others, which the Legislature desires to single out for revocation. The authority to withdraw the whole franchise includes the authority to withdraw, at the option of the Legislature, any separable single right or power, which is a part of the franchise.

Under the simple power of revocation, the State reserves in its contract the right to withdraw any one or all of the separate and divisible rights, privileges or franchises granted and nothing more. It does not include the power to amend or alter a charter in detail, in such matters as would not constitute or amount to a withdrawal of a franchise, right or privilege granted.

The revocation contemplated by the reserved power prescribed by the Constitution of 1831, of any single power or franchise separate or divisible from the others may be exercised either directly, or by implication, as by the passage of an act necessarily inconsistent with such power or franchise theretofore possessed by an existing corporation. A revocation of an exclusive grant is neces-

sarily implied from an act authorizing a street railway to construct lines in the streets of the city in which another existing corporation has already been granted an exclusive franchise.

Where a charter provides for a forfeiture of a franchise conferred by it upon the non-performance of a condition precedent, as a limitation of the time for completion of a line of railway, if the forfeiture clause declares that upon failure to comply with the condition, "such act shall become void and all the rights, privileges and franchises therein granted shall wholly cease and determine," it is self-executing.

When language less explicit and clear than "shall cease and determine" is used, the weight of authority is in favor of the view that the statute does not undertake to decree a forfeiture, but only prescribed a consequence, which should flow from certain future acts and omissions on the part of the company, and that therefore, the question whether a forfeiture of the charter had occurred, could only be determined by proper proceedings, on the part of the State.

A court of equity has no power to decree the forfeiture of a charter even at the suit of the Attorney General.

Where a street railway has, under its charter, the exclusive right of "locating, constructing and operating a city railway within the city limits," such exclusive right is a property right, entitled to the same protection as any other property right, and it has the same standing in a court of equity to raise the question of a self executing forfeiture of the charter of another company's franchise to extend its lines into the city, by reason of the failure of the latter company to build and operate its original line within the time limited, as would the landowner whose land it seeks to condemn.

Where by the charter of a railway company it was provided that "the said corporation shall have the exclusive right of laying, constructing,· operating and maintaining a city railway within the city limits;" and the act also prescribed the definite route over which the said railway should be constructed; and in another section the privilege was granted of building anywhere within the city after having first obtained the consent of the Council; *held*, that the corporation was first granted the exclusive privilege within the city limits, absolutely and explicitly, and that after the construction of its original line it might construct other railways under the conditions set forth. The most serious objections to grants of monopolies disappear when accompanied by the power reserved to the Legislature under the Constitution to revoke the monopoly feature of the grant without affecting any other rights or franchises that may have been granted.

Where a charter was granted for the construction of a "city railway," no kind of motive power being mentioned, but with a proviso that steam power should not be used without the consent of the City Council, and that suitable bells should be attached to horses drawing cars, it was *held* that the absence of any provision as to motive power to be used should be taken to indicate that the Legislature intended to permit the use either of powers then familiar, or those not then known. The omission of the mention of any motive power in the grant, and the subsequent proviso regulating the use of the two powers, with the use of which they were practicaly familiar, must be held to indicate that the Legislature left all other possible powers to be used as experience proved to be desirable.

Where the terminus of a railway line (to commence at some distance from a city) as fixed by the charter, was the boundary line of the city on U. street, and a supplement authorized an extension into the city from the point at which the railway intersected the boundary line through and along G. avenue, and extended the time for completion; but the extension provided for in the supplement was made to depend upon the building and operation by the company of "its line;" and the forfeiture clause in the last supplement·required that "the railway authorized by such act", should be built and in operation before the fiist day of January, A. D. 1898; and the road as actually built did not run to the intersection of the boundary line at U. street, but directly to G. avenue, *held*, that there was not a sufficient compliance with the conditions of the charter and the rights of the corporation thereunder were forfeited.

When the termini of a railway line are fixed and its location prescribed there can be no deviation from the route required.

A traffic agreement between two railway companies stipulating that, during the period of twenty-five years, one of the companies would not attempt to extend its tracks into or within the present limits of a city, within which by its charter it was authorized to extend its line, is *ultra vires* and against public policy, as being in restraint of competition, and a court of equity will not restrain its violation by injunction.

A corporation has no power to deprive itself by contract of a franchise accompanied by a public duty, such as the construction and operation of a railway, without express legislative sanction.

Where two railway companies entered into a traffic agreement designed to regulate their exchange of business to prevent competition, one of the companies is not estopped by its joining in the contract to

deny the corporate existence of the other, as there can be no estoppel except as to matters arising out of the contract.

A court of equity will not enforce by injunction a stipulation in a traffic agreement between two railway companies intended to prevent competition.

INJUNCTION BILL.—The complainant was a street railway company owning and operating its railway by electricity over many miles of streets of the City of Wilmington. Under its original charter, passed February 4, 1864, it claimed the exclusive right and privilege of constructing and maintaining street railways in Wilmington, and on this ground it sought to restrain the respondent, which had been chartered by the Legislature to construct and operate an electric railway partly within and partly without the City of Wilmington, from constructing and operating its proposed line within the city limits.

The injunction was sought primarily upon the ground that the complainant possessed the exclusive right to operate and maintain such a railway within the city, but the bill also alleged that the respondent, by non-compliance with the conditions prescribed by its charter, had forfeited any rights which it might otherwise have acquired under its charter.

The bill set forth a traffic agreement entered into between the respondent and the Elsmere and Wilmington Electric Railway Company, under which the cars of the respondent company were to have access to the City of Wilmington over the tracks of the complainant.

Under the charter of the respondent it was required to commence building its road within three months after the passage of the Act and to finish the construction and have the railway in operation within two years thereafter. It was alleged by the complainant that by the failure to complete its line within the time specified, the respondent had forfeited all its rights, privileges and franchises.

The complainant claimed that it had a standing in a court of equity to seek the relief prayed for, because the respondent proposed and threatened to cross its tracks, and,

by reason of the special injury which would thereby be caused to the tracks and trolley wires of the complainant it was entitled to equitable relief in the premises.

The material parts of the charters of both companies, and other legislation which was material, are sufficiently set out in the opinion.

The bill was filed November 24, 1899, and prayed for an injunction to restrain the respondent, its officers, etc., from erecting, constructing, operating or maintaining a street railway within the limits of the City of Wilmington; and also from cutting, tearing up or removing the complainant's tracks and from hindering or delaying the operation of its cars; and from interfering with, cutting or removing its trolley wires.

A rule to show cause why a preliminary injunction should not issue was granted.

Affidavits were filed on both sides. A very large number of affidavits were filed for the complainant in support of the motion for an injunction. They were directed to prove that the terminal location of the respondent's railway was not at the point required by the charter; that its railway was not completed and in operation within the time limited by the charter for its completion; that the Wilmington City Railway Company had commenced work on Sixth Street and continued it until restrained by injunction. It was also shown by the affidavit of the Secretary of the Board of Directors of the Street and Sewer Department that the Board had, on November 7, 1899, granted permission to the complainant to extend its lines on Sixth Street, but on November 14, following, that action was reconsidered and on November 21, the minutes of the meeting which set forth the affirmative vote on motion to reconsider, were read and approved; it was further deposed that "at the meeting held on the 14th of November, after the action taken by the Board, as shown by the minutes, there was an extended resolution passed by which the Board gave or attempted to give its authority to the" respondent "to use Sixth Street for railway purposes."

Wilm. City Ry. Co. *vs.* Wilm. and B. S. Ry. Co. 473

Statement of the case.

In a later affidavit the same deponent said that the complainant had no right, shown by the minutes, to use Sixth Street, and that the respondent had such right.

Other affidavits filed by the respondent set forth at large the traffic agreement and the action of the two companies and the resolution of the Board of Directors of the Street and Sewer Department of Wilmington authorizing the respondent to extend its lines on certain streets of the city. The proceedings of the respondent company, intended as a compliance with the requirement that the railway should be operated before January 1, 1898, and the efforts to prevent it by injunction were stated in detail. There were affidavits to show that there was no use of electricity as a motive power prior to the year 1881.

The answer of the respondent admitted the incorporation of the complainant and that it operated a line of railway in the City of Wilmington, but denied that it was authorized to use electricity as a motive power, or that it had met the public demand for transportation within the City of Wilmington, and it alleged that divers other street railway companies had been incorporated with power to build lines of railway within the city, and that a large number of the tracks operated by complainant within the City of Wilmington were so operated, not by virtue of the original charter of the complainant, but by the subsequent acts of incorporation in the answer recited.

It was denied that the complainant had an exclusive right and privilege of building and operating street railways within the limits of the city, and it was alleged that the only exclusive right and privilege possessed by the complaniant was to operate its original line.

The answer further set forth that under the Constitution of the State of Delaware existing at the time of the passage of the act, the Legislature reserved to itself the power of revocation, which had been exercised by the General Assembly by the passage of subsequent street railway charters under which all the lines of the complainant, except its original line, had been built and were operated.

The answer further alleged that under its charter the complainant was only authorized to operate its railway with steam power, subject to the consent of the City Council, or by horse power, and at the time of the enactment of its charter the use of electricity as a motive power was unknown; that without any authority of law, and in direct conflict with the terms of its charter, the complainant departed from the purposes of its act of incorporation, changed its motive power and since that time, without authority of law, had operated its road by electricity.

The answer charged the complainant with having constructed railways within the said city, not in response to a public demand but usually for the purpose of preventing other railways from using the streets, and that the tracks had been laid by the complainant on Union Street, south of Front Street, for the purpose of inconveniencing the respondent and putting it to trouble and expense.

The respondent admitted its own incorporation and the time limit contained therein, and it alleged that it had constructed and operated its railway within the time limit prescribed in the charter, which was January 1, 1898.

It was also alleged that after that date, the General Assembly had recognized the corporate existence of the respondent by an act of March 9, 1899, authorizing the appointment of special constables for the respondent company.

The execution of the traffic agreement was admitted by the answer, but it was denied that the execution of that agreement did or could amount to a surrender of any of the franchises or duties imposed upon the respondent as a public corporation, and that the agreement was null and void in so far as it attempted to do so.

The answer further alleged that the respondent had sought, and finally obtained, the permission of the Street and Sewer Department of the City for its use of the streets which it was authorized to use in its charter; it denied that any other person or corporation had authority to use any of those streets, and alleged that it would be necessary for the respondent to cross the tracks of the complainant, which it wa-

authorized to do under its charter, and which it intended to do without any unnecessary hindrance or delay of the cars of the complainant, or any unnecessary danger or irreparable damage to the complainant.

The respondent declared its intention, unless restrained by injunction, to lay its tracks on Sixth Street in the City of Wilmington, and tendered itself ready to make all necessary crossings of the complainant's line at its own expense, without cost to the complainant and to enter into any proper agreement to that end.

At the return of the rule the case was postponed until January 3, 1900, at which time it was heard upon the application for a preliminary injunction.

*Willard Saulsbury*, for the complainant, conceded that the charter of complainant must be strictly construed, and will not be so construed as to give the company a monopoly unless the terms of the act are explicit and incapable of any other reasonable construction.

He contended that the Constitution of 1831 provides only for a reserved power of revocation which the charter contains and which may be exercised at any time for misuse or abuse of the privileges of the company herein granted.

No right of amendment was reserved either in the charter or any amendments, and no amendment, except such as were asked for and accepted has ever been passed.

Under the contract clause of the Constitution of the United States, the charter granted in 1864, giving exclusive street railway privileges, is a contract which cannot be invalidated, impaired or affected by legislation, and, therefore, the act of the General Assembly authorizing the respondent to extend its line into the City of Wilmington is unconstitutional and void. *Louisiana Lottery vs. Fitzpatrick*, 3 *Wood* 222; *State Bank of Ohio vs. Knoop*, 16 *How.* 369; *The Slaughterhouse Case*, 16 *Wall.* 36; *New Orleans Gas Company vs. Louisiana Light Co.*, 115 *U. S.* 650; *New Orleans Waterworks Co. vs. Rivers*, 115 *U. S.* 74; *Louisville Gas Co. vs. Citizens Gas Co.*, 115 *U. S.* 683; *St. Tammany Waterworks vs. New Orleans*

*Waterworks*, 120 *U. S.* 674; *New Jersey vs. Wilson*, 7 *Cranch* 164; *Sturgis vs. Crowninshield*, 4 *Wheat*, 122; *McMillan vs. McNiell*, 4 *Wheat.* 209; *Dartmouth College vs. Woodward*, 4 *Wheat.* 518; *Rice vs. Foster*, 4 *Harring.* 491; *P. W. & B. R. R. Co. vs. Bowers*, 4 *Houst.* 506; *Enfield Toll Bridge Co. vs. Hartford &c. R. R. Co.*, 17 *Conn.* 40, 42 *Am. Dec.* 716.

Our own courts have recognized and declared the inability of the Legislature to amend an act of incorporation duly accepted, and thus have indirectly decided that the power to amend an act is not included in the constitutional reservation of the power to revoke. *Bailey vs. P. W. & B. R. R. Co.*, 4 *Harring.* 389, 400; *P. W. & B. R. R. Co. vs. Bowers*, 4 *Houst.* 506; *Rice vs. Foster*, 4 *Harring.* 479, 491-2; *Del. R. R. Co. vs. Tharp*, 5 *Harring.* 454, 456; *State vs. Bank of Smyrna*, 2 *Houst.* 99, 116, 117.

The right of the complainant to use electricity as a motive power cannot be questioned, save upon *quo warranto* by the attorney general. This was practically decided in this Court with respect to this particular corporation. *P. W. & B. R. R. Co. vs. Wilm. City Ry. Co.*, *ante p* 134, but we contend that the complainant has the right to use electricity as a motive power, and to show this I refer to statutes and ordinances bearing upon this question.

The charter of the *N. C. & W. Pass. Ry. Co.* (1859) 12 *Del. Laws* 680, was never utilized, but the motive power was limited exclusively to horse power, showing that the Legislature had in mind the difference in motive power.

In the charter of complainant the only limitation on motive power is that steam power shall not be used except with the consent of City Council, and that bells should be attached to horses drawing cars. It would seem that at that time the company could use any power except steam.

An amendment of March 26, 1891, gave an additional right to borrow money with a proviso forbidding entry upon any streets or roads to lay tracks or erect poles or wires without the consent of the duly authorized authorities of the city or county as the case may be. This recognized the use of electricity which the company had then been using for some years.

The use of electricity as a motive power was recognized by city ordinance, June 10, 1887, *Supp't. to Ord.* (1890) 57; and resolutions of the Street and Sewer Department, by resolutions of October 18,1887, Sept. 5, 1889, November 11, 1890, and February 1, 1893; and by Acts of Assembly, 15 *Del. Laws,* 505; 18 *id.* 874; 19 *id.* 904.

Other acts incorporating street railways with power to use electricity as a motive power will be found in 19 *Del. Laws* 912; *id.* 938; 20 *Del. Laws* 147; *id.* 153; *id.* 140.

A conclusive recognition by the municipal authorities of the right of complainant. to use electricity is the provision by ordinance for the collection from the complainant of a pole tax of one dollar for each and every pole erected for the purpose of supplying current to the trolley lines of the company.

The right to use electricity has also been recognized by the Superior Court in *Maxwell vs. Wilm. City Ry. Co.,* 1 *Marvel* 199.

Where a statute relating to the organization of a street railway provides simply that the corporation may organize for the operation of such railway, and make no special mention of the motive power to be employed, the company may use any motive power including electricity. *Croswell, Electricity sec.* 187; *Halsey vs. Rapid Transit Co.,* 47 *N. J. Eq.* 380, 390, 3 *Am. Elec. Cas.* 283; *Keasby, Electric Wires* 16; *Fritz vs. Erie St. Pass. Ry. Co.,* 155 *Pa. St.* 472.

A liberal construction of the means to be used in operating a street railway should be given in favor of the public, although a strict construction of the franchise might be proper. Nothing fairly incident to the purposes of the corporation should be held *ultra vires,* unless expressly prohibited. *Atty. Gen. vs. Great Eastern Ry. Co., L. R.* 5 *App. Cas.* 473.

In *Hudson River Telegraph Co. vs. Watervliet Turnpike & R. R. Co.,* 135 *N. Y.* 393, 32 *N. E.* 148, the use of electricity was authorized under a charter right "to use the power of horses, animals, or any mechanical or other power, or the combination of them, which the company may choose to employ, except the force of steam."

The right to use electricity under a statute passed before the period of electric railways has been frequently recognized. *Lanegan vs. LaFayette St. Ry. Co.*, 3 *Am. Elec. Cas.* 273; *Ogden City Ry. Co. vs. Ogden City*, 7 *Utah* 207, 3 *Am. Elec. Cas.* 325, 26 *Pac.* 288; *Lockhart vs. Craig St. Ry. Co.*, 139 *Pa. St.* 415, 2 *Am. Elec. Cas.* 314; *Detroit City Ry. Co. vs. Mills*, 85 *Mich.* 634; *Buckner vs. Hart*, 52 *Fed. Rep.* 835, 4 *Am. Elec. Cas.* 21; *North Baltimore Pass. Ry. Co. vs. North Ave. Ry. Co.* 75 *Md.* 233.

We contend that upon the proofs complainants acquired, on November 7, 1899, the right to occupy and use Sixth Street for an extension of its railway; that consent having once been given and afterwards accepted was valid and could not be recalled.

Though its charter authorizes the extension of complainant's railway by consent of Council, the Street and Sewer Department takes the place of the Council.

If the consent of the Department was once given, it has the force of a legislative act and a court of equity will not enjoin a municipal body from granting such rights. *New Orleans Waterworks vs. New Orleans*, 164 *U. S.* 471; *East Louisiana R. R. Co. vs. New Orleans*, 46 *La. Ann.* 526, 15 *South* 157; *New Orleans vs. Great Southern Tel. & Tel. Co.*, 3 *South.* 533; *Citizens St. Ry. Co. vs. City R. R. Co.*, 56 *Fed. Rep.* 746.

The right granted to build street railways is not a mere license, but vests property in the grantee to the extent necessary for the purposes of a street railway in fee and in perpetuity. *Dill. Mun. Corp. sec.* 68a; *People vs. O'Brien*, 111 *N. Y.* 1, 34; *Detroit vs. Detroit & Howell Plank Road*, 43 *Mich.* 140.

The act of incorporation of the respondent company is void for non-performance of conditions precedent. Its line was never constructed to the point at which it was authorized to cross the boundary line of the city. The building or construction of a line of railway in a direction or route contrary to that set forth in the charter is unlawful and renders the said railway a nuisance, *per se*. *Works vs. Junction R. R. Co.*

5 *McLean* 425; *Lyons vs. Orange & Manassas R. R. Co.*, 32 *Md.* 18, 30; *Brocaw vs. Board of Commissioners of Gibson County*, 73 *Ind.* 543, 546; *Brooklyn Steam Transit Co. vs. City of Brooklyn*, 78 *N. Y.* 525; *Freeman vs. Matlock*, 67 *Ind.* 99; *In re Brooklyn, Winfield & Newton R. R. Co.*, 72 *N. Y.* 245; *Elizabethtown Gas Light Co. vs. Green*, 46 *N. J. Eq.* 118, 127.

In this State it has never been questioned that the existence of a corporation cannot be inquired into if the prerequisites to its existence have been clearly performed. *P. W. & B. R. R. Co. vs. Kent County R. R. Co.*, 5 *Houst.* 127, 132; *Logan vs. McAllister*, 2 *Del. Ch.* 176; *Johnson vs. Staten*, 5 *Harring.* 449.

The course of a railroad where it is not warranted by law constitutes, of itself, irreparable damage. *Mo., Kan. & Tex. R. R. Co. vs. Tex. & St. Louis R. R. Co.*, 4 *Wood* 369.

The usurpation of a franchise which will lessen the profits of those operating under a legal franchise is *injuria sine damnum*, for the necessary admission of *damnum* makes it *injuria*. *Raritan &c. Co. vs. Del. &c. Co.*, 18 *N. J. Eq.* 546, 570.

A competing line established without authority, will be enjoined. *Central R. R. Co. of N. J. vs. Penna. R. R. Co.*, 31 *N. J. Eq.* 475, 492; *Raritan & Dela. R. R. Co. vs. Dela. & R. R. R. Co.*, 18 *N. J. Eq.* 546, 569; *Penna. R. R. Co. vs. National R. R. Co.*, 23 *N. J. Eq.* 441.

All rights of the respondent company to build a railway expired on January 1, 1898.

The respondent could not withdraw from the contract of May 10, 1898, without the consent of the other party. *Chicago &c. R. R. Co. vs. Nebraska*, 170 *U. S.* 672.

The Supreme Court of the United States holds that where the doctrine of *ultra vires* is invoked for or against a corporation it should not be permitted to prevail where it would defeat the ends of justice and work a legal wrong. *Railway Co. vs. McCarthy*, 96 *U. S.* 258; *San Antonio vs. Mehaffy*, 96 *U. S.* 312; *Whitney Arms Co. vs. Barlow*, 63 *N. Y.* 62.

*Prima facie*, a corporation may contract under seal and the burden is upon the person objecting to the contract as *ultra vires*. It must be shown on the face of it to be a breach of duty. *Shrewsbury & B. R. R. Co. vs. N. W. R. R. Co.*, 6 *H. L. Cas.* 133; *Green's Brice, Ultra Vires*, 538; *Waterman, Spec. Perf. sec.* 220.

*B. Nields* and *William S. Hilles*, for the respondent.

First, as to rights of complainant.

1. Complainant under its charter did not acquire the exclusive right of operating and owning all street railways within the city limits, but only the original line designated in section 7 of its charter.

It cannot be denied that a grant of corporate power must be construed against the corporation, and, where an exclusive franchise or monopoly is claimed, the intention to grant it will never be assumed to exist unless the legislative intention is plain and unambiguous. *Charles River Bridge vs. Warren Bridge*, 11 *Pet.* 420; *Warren Gas Light Co., vs. Penna. Gas. Co.*, 161 *Pa. St.* 510; *Detroit vs. Detroit City Ry. Co.*, 56 *Fed. Rep.* 867; *Long vs. City*, 49 *Minn.* 280, 51 *N. W.* 913; *Columbus Water Co. vs. City of Columbus*, 48 *Kan.* 99, 28 *Pac.* 1097; *North Baltimore Pass. Ry. Co. vs. North Ave. Ry. Co.*, 75 *Md.* 233, 23 *Atl.* 466; *Nash vs. Lowry*, 37 *Minn.* 261; *Booth, St. Ry. sec.* 108; 23 *A. & E. Encyc. L.*, 962; 3 *Wood. Ry.* 2064, note 2, 2065; *Thompson. Corp. secs.* 5348, 5349, 5670; *Phila. & Gray's Ferry Pass. R. R. Co's. Appeal*, 102 *Pa. St.* 123, *Binghampton Bridge*, 3 *Wall.* 51, 75.

Any doubtful points of construction are to be determined against the grantee and in favor of the public. *Oregon Ry. Co. vs. Oregonian Ry. Co.*, 130 *U. S.* 36; *Citizens St. Ry. Co. vs. Detroit Ry.*, 171 *U. S.* 48, 53; *Cooley Const. Lim.*, 252; *Suth. Stat. Const.* 486; *Black, Interp. Laws*, 321.

Applying these principles to the charter in question, the Legislature seems to have had in view two classes of railways, the main or original line with definite termini, and branches of the main line to be constructed with the consent of the City Council. To the first only the exclusive right applies.

It is under the power to construct branch lines or extensions that complainant is authorized, if at all, to construct a railway on Sixth Street, and this is not an exclusive right or privilege.

Language in a charter apparently giving an exclusive right is frequently held to be controlled or limited by other portions of the act, and where the charter is susceptible of two meanings, one restricting and the other extending the powers of the corporation, that one is to be adopted which works the least harm to the State. *Stein vs. Water Co.*, 34 *Fed. Rep.* 145; *aff'd.* 141 *U. S.* 67; *Binghampton Bridge*, 3 *Wall.* 51, 75; *Bridge Proprietors vs. Hoboken Co.* 1 *Wall.* 116; *Pearsall vs. Gt. North. Ry. Co.*, 161 *U. S.* 665; *Savannah R. R. Co. vs. Coast Line R. R. Co.*, 19 *Ga.* 202.

2. Even if it be held that the Legislature intended to give complainant an exclusive right throughout the City of Wilmington, it was exclusive only to such extent as the Legislature may be assumed to have then contemplated, and that aside from the words of the act which provided only for steam and horse power; electricity as a motive power being in 1864 unknown, could not be considered as within the contemplation of the Legislature.

We admit that it has been decided that the right of the complainant to operate an electric railway under its charter can only be questioned in *quo warranto. Phila., Wilm. & Balto. R. R. Co. vs. Wilm. City Ry. Co., ante p.* 7, 38 *Atl.* 1076. But we contest the claim that the complainant has, under its charter, an exclusive franchise to operate electric railways in Wilmington. Such a construction is against every canon of interpretation and consideration of public policy. *Opinion of the Justices*, 66 *N. H.* 629, 645; *Taggart vs. Newport St. Ry. Co.*, 16 *R. I.* 668, 19 *Atl.* 326; *Bridge Proprietors vs. Hoboken Co.*, 1 *Wall.* 116; *Piscataqua Bridge vs. New Hampshire Bridge*, 7 *N. H.* 35; *Parrot vs. Lawrence, Fed. Cas.* 10772; *Mohawk &c. Co. vs. Utica &c. R. R. Co.*, 6 *Paige Ch.* 554; *Richmond &c. R. R. Co. vs. Louisa R. R. Co.*, 13 *How.* 70, 77; *Saginaw Gas Light Co. vs. Saginaw*, 28 *Fed. Rep.* 529; *Lake vs. Virginia &c. R. R. Co.*, 25 *Ga.* 445, 457; *People vs. Newton,*

112 *N. Y.* 396; *Omaha Horse Ry. Co. vs. Cable Tramway Co. of Omaha*, 33 *Fed. Rep.* 689; *Teachout vs. Des Moines Broad Gauge St. Ry. Co.*, 75 *Ia.* 722, 36 *A. & E. R. R. Cas.* 108; *Richmond vs. Southern Bell Telephone Co.*, 174 *U. S.* 761; *State vs. Trenton*, 54 *N. J. L.* 92, 23 *Atl.* 281.

The right to use electricity as a motive power has never been conferred upon complainant by the Legislature, either in the original act, or in any amendment. *Elliott on Roads and Streets* 560; *People vs. Newton*, 48 *Hun* 47; *s.c.*, 112 *N. Y.* 396; *North Chicago R. R. vs. Town of Lake View*, 105 *Ill.* 207, 213; *Indianapolis &c. Co. vs. Citizens St. Ry. Co.*, 127 *Ind.* 369, 393, *State vs. Trenton*, 54 *N. J. L.* 92, 23 *Atl.* 281.

3. Even if the charter gave to complainant an exclusive right as claimed, the reserved power of revocation, inserted as required by the Constitution, has been exercised in the case of the respondent, as well as in other instances.

The power of Parliament over corporations is supreme, either for alteration, amendment, or repeal. 1 *Blacks. Com.* 485; 7 *A. & E. Encyc. L.* (*N. S.*) 671.

Until the decision of the *Dartmouth College case*, 4 *Wheat*, 518, the relation of a corporation to the state was uncertain, and it is useless to review decisions before that case. The result of that case was, that within a few years almost every state changed its constitution, or passed general laws to provide for a reserved power of revocation.

Prior to that decision it was not questioned that the state might, by proper proceedings, forfeit a charter for misuse or abuse, and, therefore, the subsequent practice of inserting a reserved power of revocation in the legislative grant was not to continue the power already existing, but to prevent a charter from becoming an irrevocable grant.

This distinction, however, was not immediately understood by the legislatures, or even by the courts, as appears in *Dela. R. R. Co. vs. Tharp*, 5 *Harring.* 454. The doctrine of that case is not accepted as law, but it is settled that the power of revocation is one to be summarily exercised by the Legislature. *Lothrop vs. Stedman*, 13 *Blatch.* 134; *Tomlinson vs. Branch*, 82 *U. S.* 460; *Miller vs. State*, 82 *U. S.* 478; *Holy-*

*oke vs. Lynam*, 82 *U. S.* 500. But to determine whether there had or had not been a forfeiture for abuse or misuse is a judicial and not a legislative function. *Cooley, Const. Lim.* 91.

The history of this reserved power as applied to this case has been fully discussed by the Supreme Court of the United States. The reservation of power in a state constitution to alter or revoke a grant of special privileges became a part of the charter of every corporation subsequently created. *Hamilton Gas Light Co. vs. Hamilton City*, 146 *U. S.* 258; *Tomlinson vs. Jessup*, 15 *Wall.* 454, 458; *Miller vs. State*, 15 *Wall.* 478, 488; *Holyoke vs. Lynam*, 15 *Wall.* 500; *Spring Valley Water Works vs. Shotteer*, 110 *U. S.* 347, 352; *Maine Central R. R. Co. vs. Main*, 96 *U. S.* 499, 510; *Greenwood vs. Union Freight Co.*, 105 *U. S.* 13; *Shurz vs. Cook*, 148 *U. S.* 397, 411; *Detroit vs. Howell Plank Road Co.*, 43 *Mich.* 140, 147; *Louisville Gas Co. vs. Citizens Gas Co.*, 115 *U. S.* 683.

The Legislature has frequently exercised its reserved power by enacting laws conferring rights upon other corporations, which were in conflict with the exclusive right claimed by complainant; and in some instances complainant has acquiesced in the exercise of this partial power of revocation, by operating railways in the city and exercising corporate franchises, the granting of which was an exercise of it.

4. Upon the question whether complainant had received the consent of the municipal authorities for the use of Sixth Street, it may be said:

(1) It is immaterial whether consent was granted, because consent given to one company does not preclude the Legislature from giving similar consent to another company.

(2) The complainant never received such consent. The Street and Sewer Department is but an agency of the State for the accomplishment of certain purposes of a legal nature. *Coyle vs. McIntyre*, 7 *Houst.* 44.

The charter of complainant requires consent of the Council, to extend its tracks, under section 6. As to the wisdom of permitting such extension is one involving other questions than merely the use and control of the public streets, which alone was transferred to the new Department, questions of

expediency, which might only properly be determined by Council, would necessarily be involved, and, under a strict construction of the charter, the consent of the city to the use of any street by the complainant could only properly be given by Council, as prescribed in its charter.

So far as the Department is concerned, the proof is that its consent was given to the respondent to use Sixth Street and was refused to the complainant. The latter, therefore, having no right to the use of Sixth Street, in the nature of property to be injured by the proposed action of the respondent, it has no standing in a court of equity to ask for a preliminary injunction. *Larimer and Lincoln Ry. Co. vs. Larimer Ry. Co.*, 137 *Pa. St.* 533; *People's Railroad vs. Memphis Railroad*, 10 *Wall.* 38.

Second, as to the position of the respondent.

1. It is authorized by its charter to use Sixth Street for its railway.

If there be an exclusive right conferred by the charter of complainant, it is expressly confined to "a city railway within the city limits." The respondent's railway as defined in its charter, is not a city railway, but a railway "between the city of Wilmington and Brandywine Springs." 19 *Del. Laws* 913, *ch.* 709. By the supplement it is authorized, after having constructed its line towards Wilmington, to build and extend its railway into the city to a point "which shall be the terminus of said railway." 20 *Del. Laws* 145, *ch.* 89.

The respondent is given the franchise to transfer people from Brandywine Springs to Wilmington and return, which purpose could not have been accomplished without penetrating into the centre of the City.

The original charter of the respondent providing that the railway commencing at Brandywine Springs should extend to the boundary line of Wilmington on Union Street, was by amendment changed as to the terminus. We are met with the strange proposition that the complainant, having a right to operate a street railway within the city of Wilmington, can question the erection or construction of a railway outside of the city.

By a subsequent act the time for building the road was extended to January 1, 1898. 20 *Del. Laws* 558, *ch.* 520, *sec.* 1. Though contending that the road was built and in operation before the time named, we submit that whether it was or no can be inquired into only by the State, it being a condition subsequent and not precedent. *State, ex rel. &c. vs. Hancock*, 2 *Pennewill* 252; *Cook, Corp. secs.* 638, 913; 3 *Wood Railroads secs.* 497, 499; *Elliott, Railroads secs.* 47, 607, 801; *Riggs vs. Cape Cod Canal Co.*, 137 *Mass.* 71; *Atchafalaya Bank vs. Dawson*, 13 *La.* 497; *Vermont, &c. vs. Thayer*, 24 *Vt.* 440; *Chicago City vs. Chicago & W. I. R. R. Co.*, 105 *Ill.* 73; *Atty. Gen. vs. The Superior & St. Croix R. R. Co.*, 93 *Wis.* 604; *Le Grange & Memphis R. R. Co. vs. Rainey*, 7 *Coldw.* 420; *Bybee vs. Oregon & Cal. R. R. Co.*, 139 *U. S.* 663; *Wallamit vs. Kittredge*, 5 *Sawyer* 44; *Schurlhurly vs. Harriman*, 2 *Wall.* 44; *Kansas City Horse Ry. Co. vs. Hovelman*, 79 *Mo.* 632, 20 *A. & E. R. R. Cas.* 17.

The complainant has only an easement in the streets. Its right to use them is subject to the public right, and aside from the question of the exclusive franchise, the grant to one company to use the streets does not preclude the State from granting to another company the same privilege. *Booth, St. Ry. L. sec.* 108; 1 *Elliott, Railroads sec.* 32, *Thomp., Corp. sec.* 5399; *East St. Louis Connecting Ry. vs. Union Ry. Co.*, 108 *Ill.* 265, 272; *Baltimore &c. Ry. Co. vs. State*, 45 *Md.* 596, 611; *Florida, A. & G. &c. vs. Pensacola & Ga. R. R. Co.*, 10 *Fla.* 145, 167; *Collins vs. Sherman*, 31 *Miss.* 679, 700; *Fort Worth St. R. R. Co. vs. Rosedale St. R. R. Co.*, 68 *Tex.* 163, 32 *A. & E. R. R. Cas.* 283; *Kinsman St. Ry. Co. vs. Broadway & Newburg St. Ry. Co.*, 36 *O. St.* 239.

2. But in this case it is not sought to use the tracks, but the injunction is sought to prevent respondent from crossing the tracks of the complainant. The right to cross its tracks is well settled. *P. W. & B. R. R. Co. vs. The Wilm. City Ry. Co.*, ante *p.* 134; *Brooklyn City & Jamaica R. R. Co. vs. Brooklyn City R. R. Co.*, 33 *Barb.* 420; *New York & Harlem R. R. Co. vs. Forty-second St. & Grand St. Ferry R. R. Co.*, 50 *Barb.* 309; *Market St. &c. Co. vs. Central Ry. Co.*, 51 *Cal.*

583; *Consolidated Traction Co. vs. South Orange & M. Traction Co.*, 56 *N. J. Eq.* 569, 40 *Atl.* 15; 1 *Thomp., Corp.* 531; 7 *Thomp., Corp. sec.* 8212; *High. Inj. secs.* 609 *to* 611; *Crawfordsville &c. vs. Smith*, 89 *Ind.* 290; 3 *Elliott on Railroads sec.*1116, 1127; *Peoria & Pekin Union R. R. Co. vs. Peoria & Farmington R. R. Co.*, 105 *Ill.* 110; *Du Bois &c. Ry. Co. vs. Buffalo &c. R. R. Co.*, 149 *Pa. St.* 1; 3 *Rapalje & Mack's Digest*, *title* "*Crossing of Railroads*;" *New Orleans City R. R. vs. Crescent City R. R.*, 12 *Fed. Rep.* 308; *St. Louis, &c. R. R. Co. vs. St. Louis Merchants &c. R. R. Co.*, Mo. 666, 111; 55 A. & E. R. R. Cas. 17, Henderson vs. Ogden City R. R., 7 Utah 199, 46 A. & E. R. R. Cas. 95.

The right of one Company to cross the tracks of other roads is recognized by legislation providing a method and manner for so doing. 20 *Del. Laws*, *ch.* 89, *sec.* 6.

3. The corporate existence of the respondent has been recognized both by the complainant and by the Legislature.

After the alleged failure of the respondent to complete its road, the complainant entered into a contract with it, which admits its corporate existence. 1 *Thomp., Corp. secs.* 518, *et seq.*, 7647, 7658, 8213; *Inskeep vs. Shields*, 4 *How.* 345; *Short vs. Prettyman*, 1 *Houst.* 334.

So an act passed by the Legislature at its last session, March 9, 1899, authorizing the appointment of special constables for respondent, named it as a corporation existing under the laws of the State of Delaware, 21 *Del. Laws* 612, *ch.* 345.

Such legislation is a valid and effectual legislative recognition of corporate existence. *Mead vs. New York, H. & N. R. R. Co.*, 45 *Conn.* 199; *McAulley vs. Columbus R. R. Co.*, 83 *Ill.* 348; *Johnson vs. Crawley*, 25 *Ga.* 316; *Jameson vs. The People*, 16 *Ill.* 257; *Dunning vs. New Albany & Salem R. R. Co.*, 2 *Ind.* 437; *Society of Middlesex Husbandmen and Manufacturers vs. Davis*, 3 *Metc.* 133; *Atlantic &c. vs. St. Louis*, 66 *Mo.* 228.

4. The traffic contract, in so far as it was an attempt on the part of the respondent to surrender its franchise, is in-

operative as *ultra vires*, and against public policy. 7 *Thomp.,
Corp. sec.* 8392; *Pullman Palace Car Co. vs. Central, &c. Co.,*
139 *U. S.* 24, 11 *Sup. Ct.* 489; *Middlesex R. R. Co. vs. Boston
& Chelsea R. R. Co.,* 115 *Mass.* 347; *Rollins vs. Clay,* 33 *Me.*
132; *Fietsam vs.. Hay,* 122 *Ill.* 293.

5. But whatever construction may be given to this con-
tract, it is manifest that the proper remedy for a breach of
it is not an injunction, but a suit at law.  *High, Inj. sec.* 1107;
*Satterthwait vs. Marshall,* 4 *Del. Ch.* 337, 338; *Diamond State
Iron Co. vs. Todd,* 6 *Del. Ch.* 163, 178, *aff'd.* 8 *Houst.* 372.

The Chancellor:—

The bill in this cause was filed November 24, 1899, and
in addition to the usual prayers for answer, subpoenas and
further relief, prays as follows:

"That the said respondent, its successors, officers em-
ployes, workmen, contractors, agents, deputies, and attorneys,
may be restrained by the injunction of this Honorable Court
from locating, constructing, operating, or maintaining a city
railway within the city limits of the city of Wilmington; from
cutting, tearing up, or removing the tracks of your orator, or
any portion thereof; from hindering or delaying the opera-
tion of the cars over the lines of your orator; from interfering
with, cutting, or removing the trolley wires of your orator, or
any portions thereof; and from operating or attempting to
operate its railway except in accordance with the terms of
the contract hereinbefore set forth; and that a preliminary in-
junction may be issued from this Honorable Court restraining
said respondent and its successors, officers, employes, con-
tractors, workmen, agents, deputies, and attorneys in like
manner until the further order of the Chancellor."

Upon the presentation of complainant's bill, the Chan-
cellor being absent from the State at the time, the Chief Jus-
tice in accordance with the provision of the Constitution in
such case made and provided, granted a rule, returnable be-
fore the Chancellor, to show cause why the preliminary in-
junction prayed for in said bill should not be awarded, with a
restraining order until the determination of the rule.

The respondent filed its answer January 3, 1900.

Affidavits have been presented and read on both sides, and the questions involved argued by counsel upon the motion for a preliminary injunction with remarkable fullness and earnestness, the pecuniary interests at stake being very large, and the principles involved of great importance.

The complainant operates many miles of electric street railway in the city of Wilmington by what is known as the "trolley system," and claims as a vested right, so long as its charter is unrevoked, the exclusive right and privilege of locating, constructing, operating and maintaining street railways in the City of Wilmington under its original charter passed at Dover, February 4, 1864, being chapter 406, 12 *Del. Laws.* This is one of the grounds upon which it prays this Court to restrain the defendant, which, under the authority of a special charter, and the supplements thereto, seeks to locate and operate another electric railway on certain streets in the City of Wilmington, from entering the city, or crossing complainant's tracks. Although other and entirely independent reasons for the relief asked are alleged in the bill, and urged with equal earnestness and ability by complainant's counsel, yet this is the most fundamental and far-reaching contention, and one which, if sustained, would dispense with the consideration of any of the others.

Section 7 of complainant's charter (12 *Del. Laws*, 429) provides as follows:

"It shall be the business of the said corporation to locate, construct operate and maintain a city railway for the carriage of passengers and freight for compensation within the city of Wilmington, with the privilege also of extending such railway to any place or places outside of the city, not more than six miles distant from the city limits. The said corporation shall have the exclusive right and privilege of locating, constructing, operating and maintaining a city railway within the city limits. The said railway shall commence near the depot of the Philadelphia, Wilmington and Baltimore Railroad Company, and thence shall extend to the intersection of Front street and Market street by the street or streets most directly leading thereto; thence through and along Market street to its intersection with Tenth street, and thence through and along Tenth street and Delaware avenue to such place or places as the directors may select, either within or with-

out the city, not being more than six miles distant from the city limits. * * * And provided also, that steam power shall not be used to propel the cars of the said company unless with the consent of the city council, and that in order to prevent accidents, suitable bells shall be attached to the horses drawing the cars. The said railway may cross any track of any railroad company, now incorporated or hereafter to be incorporated: provided, that it conform to the grade of the track to be crossed."

Section 8 is as follows:

"The said corporation shall at any time have full power to locate, alter and extend its tracks through and along any streets, avenues, highways and turnpikes in the City of Wilmington; provided, that the consent of the council of the said city shall first be obtained so to do. And the said corporation shall at any time have full power to locate, alter and extend its tracks from said city to any place or places outside of the city not more than six miles distant from the city limits. And with respect to any railway which may hereafter be located and constructed under the provisions of this section, the said corporation shall have and exercise all the rights and privileges, and be subject to all the duties and responsibilities which shall belong to or devolve upon the said corporation with respect to the railway to be originally located, constructed, operated and maintained under the provisions of this act."

Counsel for the respondent have analyzed these sections and, applying to them the strict rules of construction adopted by all our courts with reference to grants of exclusive rights, or monopolies of any sort, they have argued:

First. That the grant of exclusive right within the city is limited by the context to the line described in section 7, viz. from the depot of the Philadelphia, Wilmington, & Baltimore Railroad Company out Market Street and Delaware Avenue, and does not extend to the additional tracks which the complainant is authorized by section 8 to locate and extend "through and along any streets, avenues, highways, and turnpikes in the City of Wilmington."

Second. That no authority was granted in the charter to use electricity as a motive power, and therefore the grant of exclusive right, whether confined to the Market Street and Delaware Avenue line, or including the whole city, could not mean an exclusive right to operate an electric street railway.

and could not enable complainant to prevent the construction and operation of another electric street railway by another company.

They further argued that, even admitting complainant's contention that the grant of exclusive right applied to the whole City of Wilmington, and to the operation of street railways by electricity as a motive power, as well as by horses or steam, yet the legislature had the power to revoke this exclusive right, without revoking the whole charter, under the power of revocation expressly reserved by the Constitution of 1831, and that by necessary implication the Legislature has done so, in so far as it has granted to the respondent the inconsistent right to locate and operate an electric railway on certain specifically described streets in the City of Wilmington

This contention fairly raises the question of the precise meaning and effect of a clause in *section* 17, *art.* 2, *Const.* 1831, which for many years has been discussed by lawyers in this State, but which never yet has been authoritatively decided by our Courts. With the context, this clause reads: "No act of incorporation except for the renewal of existing corporations, shall be hereafter enacted without the concurrence by two-thirds of each branch of the Legislature; and with a reserved power of revocation by the Legislature."

Counsel have cited all the cases in which our State Courts have hinted in any way at a construction of this clause, and have omitted none of the long line of decisions of the Supreme Court of the United States, applicable to this question. All of which it will be necessary for me to examine and review in order to arrive at a construction of this constitutional provision which shall be in harmony with the authorities this Court is bound to respect.

The Dartmouth College Case was the first in which the phrase, "impair the obligation of a contract," contained in *Art.* 1, *sec.* 10 of the Constitution of the United States, received a direct judicial construction making it applicable to corporate charters, and it is generally agreed that there is no decision of the Supreme Court more important in its results, or cited and analyzed more frequently. Chief Justice

Marshall, Mr. Justice Washington, and Mr. Justice Story each delivered a separate opinion. Mr. Justice Johnson and Mr. Justice Livingtsone concurred, and Mr. Justice Duvall dissented. Mr. Justice Story, at the conclusion of his opinion, said:

"In my judgment, it is perfectly clear that any act of the legislature which takes away any powers or franchises vested by its charter in a private corporation or its corporate officers, or which restrains or controls the legitimate exercise of them, or transfers them to other persons without their assent, is a violation of the obligation of that charter. If the legislature mean to claim such an authority, it must be reserved in the grant." *Dartmouth College vs. Woodward*, 4 *Wheat.* 518, 712, 4 *L. Ed.* 629.

As the meaning and practical consequences of this decision became known throughout the Union, the different States took steps to avoid its effect in the future, and to retain legislative control of corporations to be thereafter created, by acting on the hint given by Mr. Justice Story. In some, the authority was reserved—as in Delaware—by a constitutional provision; in others by general statute. In nearly all of them the language used in reserving the power was to "amend, alter, or repeal the charter." In Massachusetts "at the pleasure of the legislature," was added. In Georgia it was simply "to withdraw the franchise." In our own State it consisted in a prohibition to create corporations except "with a reserved power of revocation by the legislature." In the case of *Waterworks vs. Schottler*, 110 *U. S.* 353, 4 *Sup. Ct.* 50, 28 *L. Ed.* 175, Chief Justice Waite, discussing the California statute, says: "The reservation of power to alter or repeal the charters of corporations was not new, for almost immediately after the judgment of this court in the *Dartmouth College Case (Dartmouth College vs. Woodward*, 4 *Wheat.* 518, 4 *L. Ed.* 629) the states (many of them), in granting charters, acted on the suggestion of Mr. Justice Story in his concurring opinion (*page* 712, 4 *Wheat.*, and *page* 712, 4 *L. Ed.*), and inserted provisions by which such authority was expressly retained." The Supreme Court in all cases have held that such

a reservation of power either in a constitution or general statute became a part of all charters subsequently granted as if expressed in the instrument itself. *Tomlinson vs. Jessup*, 15 *Wall.* 456, 41 *L. Ed.* 204; *Miller vs. State*, 15 *Wall.* 478, 494, 21 *L. Ed.* 98; *Holyoke Co. vs. Lynam*, 15 *Wall.* 500, 506, 21 *L. Ed.* 133; *Shields vs. Ohio*, 95 *U. S.* 324, 24 *L. Ed.* 357; *Maine Cent. R. Co. vs. Maine*, 96 *U. S.* 500, 24 *L. Ed.* 963; *Greenwood vs. Freight Co.*, 105 *U. S.* 17, 26 *L. Ed.* 961; *Atlantic & G. R. Co. vs. Georgia*, 98 *U. S.* 361, 25 *L. Ed.* 185; *Close vs. Cemetery Co.*, 107 *U. S.* 466, 476, 2 *Sup. Ct.* 267, 27 *L. Ed.* 408; *Waterworks vs. Schottler*, 110 *U. S.* 353; 4 *Sup. Ct.* 48, 28 *L. Ed.* 173; *Hamilton Gaslight & Coke Co. vs. City of Hamilton*, 146 *U. S.* 258, 270, 13 *Sup. Ct.* 90, 36 *L. Ed.* 936; *New York & N. E. R. Co. vs. Town of Bristol*, 151 *U. S.* 556, 567; 14 *Sup. Ct.* 437, 38 *L. Ed.* 269; *Pennsylvania College Cases*, 13 *Wall.* 190, 213, 20 *L. Ed.* 550; *Sinking Fund Cases*, 99 *U. S.* 700, 25 *L. Ed.* 496.

That court has also settled the principle that the power so reserved must necessarily be exercised, as expressed in the Massachusetts statute, 'at the pleasure of the legislature." *Hamilton Gaslight & Coke Co. vs. City of Hamilton*, *supra*. In that case Mr. Justice Harlan, delivering the opinion of the court, states the law upon both points clearly and emphatically, as follows (*page* 270, 146 *U. S*):

"This reservation of power to alter or revoke a grant of special privileges necessarily became a part of the charter of every corporation formed under the general statute providing for the formation of corporations. A legislative grant to a corporation of special privileges, if not forbidden by the constitution, may be a contract; but where one of the conditions of the grant is that the legislature may alter or revoke it, a law altering or revoking, or which has the effect to alter or revoke, the exclusive character of such privileges, cannot be regarded as impairing the obligation of the contract, whatever may be the motive of the legislature, or however harshly such legislation may operate in the particular case upon the corporation or parties affected by it. The corporation, by accepting the grant subject to the legislative

power so reserved by the constitution, must be held to have assented to such reservation. These views are supported by the decisions of this court. In *Greenwood vs. Freight Co.*,105 *U. S.* 13, 17, 26 *L. Ed.* 961, the question was as to the scope and effect of a clause in a general statute of Massachusetts providing that every act of incorporation passed after a named day 'shall be subject to amendment, alteration, or repeal at the pleasure of the legislature.' This court, referring to that clause, said: 'Such an act may be amended; that is, it may be changed by additions to its terms, or by qualifications of the same. It may be altered by the same power, and it may be repealed. What is it may be repealed? It is the act of incorporation. It is this original law on which the corporate existence of a company depends which may be repealed, so that it shall cease to be a law; or the legislature may adopt the milder course of amending the law in matters which need amendment, or altering it where it needs substantial change. All this may be done at the pleasure of the legislature. That body need give no reasons for its action in the matter. The validity of such action does not depend on the necessity for it, or on the soundness of the reasons which prompted it.' The words 'at pleasure of the legislature' are not in the clauses of the constitution of Ohio, or in the statutes to which we have referred. But the general reservation of the power to alter, revoke, or repeal a grant of special privileges necessarily implies that the power may be exerted at the pleasure of the legislature."

This conclusion of the Court follows inevitably from the very nature of legislative power, but I have cited the language of the Supreme Court at length, because upon this subject its judgment is final and conclusive. And there is no decision of any of the Courts of our own State in conflict with these conclusions, although there is an *obiter dictum* reported in the case of *Railroad Co. vs. Tharp*, 5 *Harring.* 454. The Superior Court there held that the constitutional reservation of the power of revocation need not be expressly made in the charter, as its object was effected by the Constitution without any aid from the legislative act. It is therefore not

necessary for me to comment upon the *obiter dictum* contained in the opinion, that the reasonable construction of the Constitution is that the revocation shall be upon examination and trial before the Legislature, and upon the ground of misuse or abuse of the privileges granted. It may be well to add, however, that the reason given in the opinion for this peculiar view was that any other construction would be fatal to all public improvements through corporations, as or "no one would invest his money in a bank, railroad, or canal if his rights were constantly subject to be taken away without cause."

The experience of the State of Massachusetts, long a favorite home of such corporations, although they have express notice that their charters may at any time be amended, altered, or repealed at the pleasure of the legislature, is a sufficient commentary upon the practical sagacity of this reasoning, to say nothing of its legal force.

It may be considered settled, therefore, beyond the possibility of doubt, that the constitutional reservation of the power of revocation by the Legislature became a part of the charter of the Wilmington City Railway Company as if it had been inserted therein *ipsissimis verbis*, and that the Legislature might exert that power at any time, and for any reasons that might seem sufficient to itself; or, in other words, at its pleasure.

It only remains, therefore, to ascertain the precise meaning of the phrase "power of revocation," and wherein it differs from the phrase "to amend, alter, or repeal the charter," employed in the reservation clause of the constitutions or statutes of most of our sister states. The latter phrase is so nearly universal that counsel in this cause, after thorough investigation, have been able to find but one state besides Delaware in which other language is used, and that is the state of Georgia, which, as I have before stated, uses the phrase, "to withdraw the franchise." The Supreme Court of the United States has put a construction upon this latter phrase in a case already cited, viz. *Atlantic & G. R. Co. vs. Georgia*, 98 *U. S.* 360, 25 *L. Ed.* 185. Mr. Justice Strong, who

delivered the opinion of the court, says (page 365, 98 U. S., and page 187, 25 L. Ed.): "It is quite too narrow a definition of the word 'franchise,' used in this statute, to hold it as meaning only the right to be a corporation. The word is generic, covering all the rights granted by the Legislature. As the greater power includes every less power which is a part of it, the right to withdraw a franchise must authorize a withdrawal of every or any right or privilege which is a part of the franchise. So it was held in *Central Railroad & Banking Co. vs. Georgia*, 54 *Ga.* 401, and so it must be held now, especially in view of the statutory provision of the Code that private corporations are subject to be changed, modified, or destroyed at the will of their creator." This last statutory provision of the Code to which the learned justice refers is the following: "Sec. 1051. Persons are either natural or artificial. The latter are creatures of the law, and except so far as the law forbids it, subject to be changed, modified or destroyed at the will of the creator; they are called corporations." The reasoning of Mr. Justice Strong, which I have quoted, is entirely independent of any force which this section might be construed to possess, and clearly recognizes, on the one hand, that the authority "to withdraw the franchise" is not the same as the authority "to alter, amend, or repeal," and, on the other hand, that it would be a narrow and unnatural construction to hold that the authority to withdraw the whole franchise does not include the authority to withdraw, at the option of the legislature, any single right or privilege which is a part of the franchise. It is obvious that the reasoning in that case would apply with still greater force to the phrase used in our own Constitution of 1831. The reservation in our Constitution was, broadly, the "power of revocation,"—revocation; that is, recall. Recall of what? Does that phrase confer the power to revoke the whole charter, to repeal the act of incorporation, and yet not include the power to revoke any single right or privilege which is a part of the franchise? Is it a reasonable construction of a general reservation of "the power of revocation" to hold that it reserves to the Legislature the power to take away all "the powers or fran-

chises vested by its charter in a private corporation," and yet does not include the power to take away some single power or franchise separate and divisible from the others, which the Legislature desires to single out for revocation? I think not. A careful examination of the line of Supreme Court decisions to which I have already referred, discloses principles laid down and distinctions made by that tribunal, which go far towards removing every shadow of ambiguity from this phrase in our own Constitution, and also suggests reasons why the power "to amend, alter, or repeal the charter," found in the constitutions or general statutes of our sister states, was not the phrase adopted by the framers of the Constitution of 1831; reasons which reflect credit upon the wisdom and sagacity of the very exceptional men who controlled the Constitutional Convention of 1831. The last case in which the United States Supreme Court has expressed in general terms its interpretation of the power reserved to the legislature to alter, amend, or repeal a charter is *New York & N. E. R. Co. vs. Town of Bristol*, 151 *U. S.* 567, 14 *Sup. Ct.* 437, 38 *L. Ed.* 269. Mr. Chief Justice Fuller delivered the opinion of the Court, and quoted from *Close vs. Cemetery Co.*, 107 *U. S.* 476, 2 *Sup. Ct.* 267, 27 *L. Ed.* 408, as follows: "A power reserved to the Legislature to alter, amend, or repeal a charter, authorizes it to make any alteration or amendment of a charter granted subject to it which will not defeat, or substantially impair, the object of the grant, or any rights vested under it, and which the Legislature may deem necessary to secure either that object or any public right." Among the Legislative amendments sustained by the Court as being authorized by that reserved power are the following: An Act changing the number of directors of a railroad company, *Miller vs. State*, 15 *Wall.* 494, 21 *L. Ed.* 98, Mr. Justice Clifford delivering the opinion of the Court, and Justices Field and Bradley dissenting (1872); an act fixing the rate of fare per mile to be charged by a railroad company for the carriage of passengers, *Shields vs. Ohio*, 95 *U. S.* 324, 24 *L. Ed.* 357, Mr. Justice Swayne delivering the opinion of the Court, and Justices Field and Strong dissenting (1877); an act regulating

the disposition to be made of certain portions of the revenues of the Union Pacific and Central Pacific Railroad Companies, *Sinking Fund Cases*, 99 *U. S.* 700, 25 *L. Ed.* 496, Mr. Chief Justice Waite delivering the opinion of the Court, and Justices Strong, Field, and Bradley dissenting, each writing a long dissenting opinion (1878); an act fixing the rates to be charged for furnishing water by a waterworks company, *Waterworks vs. Schottler*, 110 *U. S.* 353, 2 *Sup. Ct.* 267, 27 *L. Ed.* 208, Mr. Chief Justice Waite delivering the opinion of the Court, and Mr. Justice Field dissenting in a long and vigorous opinion.

It is plainly manifest from this brief statement of some of the statutes which the Supreme Court has held to be authorized by a power reserved to the legislature "to amend, alter, or repeal" a charter, that not one of those acts could be sustained under an authority reserved to the legislature simply to withdraw, recall, or revoke any or all of the rights, privileges, or franchises granted by the charter. Each of those acts regulates and alters the conduct and business of the corporation affected, instead of merely withdrawing a right or franchise. One changes the constitution of a board of directors, another regulates the revenues, by prescribing the rates which shall be charged for passengers carried, another for water furnished, and still another dictates the disposition which shall be made of its revenues. Obviously, these are exercises of power very different from the revocation or withdrawal of a right or franchise, and the reasoning of the Court, as well as that of the dissenting Justices, emphasizes the difference.

But the view I have suggested of the distinction between these different reservations of legislative power may be made still clearer by a statement of statutes sustained by the Court under the former power,—that is, "to alter, amend, or repeal,"—which could be sustained just as well under the simple power of revocation of one or all of the rights, privileges, or franchises granted by the charter.

The statutes to which I would refer are the following; An act under which taxes were levied on the property of a

railroad whose charter contained a perpetual exemption from taxation, *Tomlinson vs. Jessup*, 15 *Wall*. 456, 21 *L. Ed*. 204, Mr. Justice Field delivering the opinion of the Court (1872); an act repealing an act of incorporation, *Greenwood vs. Freight Co.*, 105 *U. S*. 17, 26 *L. Ed*. 961, Mr. Justice Miller delivering the opinion of the Court (1881); an act authorizing municipalities to erect gas works, against which a gas company, long in operation, claimed an exclusive right against the town of Hamilton, *Hamilton Gaslight & Coke Co. vs. City of Hamilton*, 146 *U. S*. 270, 13 *Sup. Ct*. 90, 36 *L. Ed*. 963, Mr. Justice Harlan delivering the opinion of the Court (1882). One act has the effect to revoke the privilege of exemption from taxation, another an exclusive right to operate gas works, and a third is an absolute repeal of the charter,—a revocation of all the franchises. The act sustained by the United States Supreme Court under the power "to withdraw the franchise" reserved to the Legislature of Georgia in the case of *Atlantic & G. R. Co. vs. Georgia*, already cited, was an act the effect of which was to withdraw from the railroad company the privilege of certain exemptions from taxation. Two Georgia State Court cases have also been cited. In one, *Central Roilroad & Banking Co. vs. Georgia*, 54 *Ga*. 404, the Supreme Court sustained an act withdrawing in like manner certain privileges of exemption from taxation, and in the other, *West End & A. St. R. Co. vs. Atlanta St. R. Co.*, 49 *Ga*. 151, 158, the Court sustained an act which had the effect to withdraw from a street railway company the exclusive privilege claimed by it to construct and operate street railways on all the streets of Atlanta, by granting to another street railway company the right to construct railways on any street in the city.

A critical examination of the opinions rendered in the cases I have cited, especially in connection with the vigorous dissenting opinions referred to, would bring out the distinction I have made in a still stronger light; but it seems to me to be sufficiently plain already, and I merely refer to them.

The difficulties experienced by the Supreme Court in dealing with the common reservation of power "to amend, alter, or repeal a charter" are made manifest by the following

extraordinary expressions in the opinion of the Court in *Shields vs. Ohio*, 95 *U. S.* 324, 24 *L. Ed.* 359, above cited.

"The power of alteration and amendment is not without limit. The alterations must be reasonable; they must be made in good faith, and be consistent with the scope and object of the act of incorporation."

I apply the term "extraordinary" to this language, in view of the fundamental and universally recognized conception of the constitutional functions of the legislative and judicial branches of our government, respectively, and in contemplation of the practical attitude of a court applying a principle requiring it to pass upon the reasonableness of an act of the Legislature, or to ascertain whether a given amendment to a corporate charter was made by the Legislature in good faith. In this connection, I will again cite the later case of *Hamilton Gaslight & Coke Co. vs. City of Hamilton*, from which I have already quoted at large.

The simple power of revocation or withdrawal of a franchise, on the other hand, presents the question always in a simple light. Under it none of the difficulties can arise which have so troubled the Supreme Court under the other reservation of power. There can be no attempt to fix rates or charges, change boards of directors, or control the disposition of corporate revenues or the management of corporate property, except in cases coming within the police power of the State. Under the simple power of revocation, the State reserves in its contract the right to withdraw any one or all of the separate and divisible rights, privileges, or franchises granted, and nothing more. The State reserves that power as a protection against improvident grants of privileges which are afterwards seen to be oppressive, or injurious to the public, or are so altered in practical effect, by changes consequent upon unforeseen conditions, as to become so. The wisdom of the reservation of the other power might well be questioned, as opening wide the door to a class of legislation opposed to the traditions and principles which have in the main controlled English speaking legislatures in all their past history, and encouraged the rapid industrial progress of communities under the

sway of the Common Law. Such are the reasons which may well have decided the framers of the Constitution of 1831, experienced lawyers and statesmen as they were, and knowing well the value of words, and the niceties and difficulties of judicial interpretation.

Now, although, as I have already stated, the question of the meaning and effect of this constitutional reservation has never been passed upon by our own Courts affirmatively, yet there is one notable case decided by the Court of Errors and Appeals, which, by holding an act fixing the rate of fare to be charged by the Philadelphia, Wilmington & Baltimore Railroad Company to be unconstitutional, as a violation of the obligation of a contract, puts a construction upon it in strict harmony with the distinction to which I have called attention, on its negative side, although the Court was entirely silent as to its affirmative construction, no analysis whatever being made of the clause, and the argument for the act being entirely under the general police power and the power to regulate common carriers. *P. W. & B. R. R. Co. vs. Bowers*, 4 *Houst.* 540. The only other case in our State deserving mention at all in this connection is *Bailey vs. P. W. & B. R. R. Co.*, 4 *Harring.* 400. In that case it was held that an act providing for the recovery of damages from the company for obstructing navigation by a bridge authorized by its charter was unconstitutional, if construed to impose conditions not contained in the charter. Upon the construction of the reserved power of revocation it contains nothing in conflict with the decisions of the Supreme Court, which I have cited, although decided long before those decisions were delivered.

This long review of the authorities shows that there is no decision of any sort in opposition to the plain, logical interpretation of the phrase, "reserved power of revocation by the Legislature," as meaning the power to revoke, at the pleasure of the Legislature, any or all of the franchises granted to a corporation, the power to recall all the rights, privileges, or franchises granted to a corporation, or any number less than all, or any single right, privilege, or franchise; that it

cannot mean less than this, and that it cannot mean more, and that it differs from the reserved power "to alter, amend, or repeal the charter" in not including the power to regulate or control corporations in the manner illustrated by the cases I have cited. The revocation can be either direct, or, as in the Georgia case I have cited, *West End & A. St. R. Co. vs. Atlanta St. R. Co.,* by necessary implication, by the passage of an act necessarily inconsistent with some right or privilege possessed by some existing corporation, which is the character of the legislative revocation in the present case.

The act which it is claimed, revokes *pro tanto* the exclusive right claimed by the complainant, the Wilmington City Railway Company, was passed prior to the promulgation of the present Constitution, being chapter 89, 20 *Del. Laws*, entitled "A supplement to an act entitled 'An act to incorporate the Wilmington and Brandywine Springs Railway Company,'" passed at Dover, May 1, 1895. It provides as follows:

"Sec. 3. That the corporation created by the act to which this is a supplement, when it shall have completely built and constructed its line, beginning its construction at Brandywine Springs and building it towards Wilmington, is hereby authorized to build and extend its railway from the point at which such railway intersects the boundary line of the city of Wilmington to, through and along Greenhill avenue to its intersection with Sixth street, thence through and along Sixth street and to such point on French street or Walnut street between Fourth and Sixth streets as its directors may determine upon, which shall be the terminus of said railway; but before entering upon any street of the city of Wilmington, consent shall first be obtained of the authorities for the time being having the control of the streets of the said city, on such terms and conditions as they may impose and require."

The respondent cites a number of similar acts passed by the Legislature since the grant of the exclusive right or monopoly claimed by the complainant, which have granted to other corporations the right to locate and operate electric railways in certain specified streets of the City of Wilmington, several of which they allege have been purchased or leased and are now operated by the complainant. The complainant states that one of them is operated by it. It is unnecessary, however, to discuss the effect, if any, of these acts of incorporation, inasmuch as it follows clearly from the principles already laid down that the act incorporating the Wilmington and Brandy-

wine Springs Ry. Co. was an exercise *pro tanto* by the Legislature of the power of revocation reserved to it by the Constitution, and deprived the complainant of any exclusive right it may have had to the streets specified therein as against the respondent, leaving it in possession of all its other rights or franchises, only shorn of the exclusiveness claimed.

Thus far, I have considered only the constitutionality and efficacy of the act under which the respondent claims the right to locate, construct, and operate its railway in the City of Wilmington on the streets therein specified; for, if the grant of the franchise were a violation of the Constitution, the respondent would have no color of right, and be a mere trespasser. But the conclusion to which I have arrived, that the grant was constitutional, brings me to the consideration of other contentions of the complainant raising the questions of forfeiture and non-compliance with conditions.

The respondent urges that the complainant has no standing in this Court to raise these questions, which it claims can be determined only by *quo warranto* proceedings brought in the name of the State; but, before taking up the discussion of this difficult question and the multitude of more or less vague and conflicting decisions which go to make up the American doctrine upon the subject, it will be conducive to clearness to state first, with some degree of fullness, precisely what these contentions are.

Now, I have already quoted in full, section 3 of a supplement to respondent's original charter authorizing it to build and extend its railway into the city of Wilmington on the streets upon which it seeks to construct and operate its line, subject to the consent of the authorities for the time being having the control of the streets of the city, on such terms and conditions as they may impose and require, which consent appears to have been given.

Section 6 of the same act further provides that:

"Should the track of any railway operated by electricity be crossed by the line of the company, the crossing shall be made, constructed, maintained and operated so as not to interfere with the passage of the cars of the line to be so crossed, and the expense of making and maintaining said crossing shall be paid by the company desiring such cross-

ing to be constructed, and the privilege of the right of way thereon shall be attached to the company first enjoying the grant covered by said crossing, and if watchmen, signalmen or switchmen be required by said authorities having authority over said crossing, the same shall be selected by said company and their wages, as well as all other costs and expenses rendered necessary by such crossing, shall be paid, advanced, and liquidated by the company for whose benefit the said crossing is to be or shall be made."

The respondent professes to be ready and willing to comply with these conditions, and no question is raised in relation to them.

But complainant contends:

First.   That all the rights, privileges, and franchises granted to the respondent have wholly ceased and determined by reason of its failure to complete its line in the time specified in the grant, and that on that ground the complainant, has a standing in a court of equity to demand the relief prayed for, by reason of the special injury it will necessarily receive to its tracks and trolley wires and the operation of its road, no matter how the crossing may be constructed or managed, and also by reason of the injury to its business and profits on account of the threatened competition.

Second.   It claims that respondent's act of incorporation (being *chapter* 709, 19 *Del. Laws*), entitled "An act to incorporate the Wilmington and Brandywine Springs Railway Company," provided as follows:  "*Sec.* 4.  The railway of said company shall be located and constructed along the following routes, viz.: beginning at Brandywine Springs, in Mill Creek hundred, New Castle county; thence by such route as the directors may deem most desirable, to the boundary line of the city of Wilmington on Union street."   It also claims that the supplement provided, in the section above quoted:  "That the corporation created by the act to which this is a supplement, when it shall have completely built and constructed its line, beginning its construction at Brandywine Springs and building it towards Wilmington, is hereby authorized to build and extend its railway from the point at which such railway intersects the boundary line of the city of Wilmington, to, through and along Greenhill avenue," etc., naming the streets along which respondent proposes to lay

its tracks; and that this line mentioned in the supplement can only mean the line described in the original charter, which terminates at the boundary line of the city on Union Street; but that the respondent "has never completed its line to the boundary line of the city of Wilmington on Union street," having built directly to Greenhill avenue instead, and now seeks to build through and along Greenhill avenue without first completing its line to the boundary of the city at Union Street, and thence extending to Greenhill Avenue, and that in consequence the right to build through Greenhill Avenue to its intersection with Sixth Street, and so on, never vested.

The respondent's original act of incorporation was passed April 14, 1893, and the limitation as to time was ex-expressed as follows in section 4: "Provided, however, that the construction of the railway herein authorized shall be commenced within three months after the passage of this act and it shall be in operation within two years thereafter, otherwise this act shall become void and all the rights, privileges and franchises herein granted shall wholly cease and determine." Before the expiration of the time limited in this act, it was provided by *chapter* 89, 20 *Del. Laws*, passed May 1, 1895, being the supplement already cited, as follows: "That the rights, privileges and frachises granted by the act to which this act is a supplement are hereby continued in full force, and shall not cease or be forfeited, provided that the railway authorized by said act to which this act is a supplement, shall be built and in operation on or before the first day of May, A. D. 1897, otherwise such act shall become void and all the rights, privileges and franchises therein granted shall wholly cease and determine." On the 1st day of April, 1897, still another supplement was passed, waiving forfeiture again in the same terms, and again extending the time.

To present the contention of the complainant in its full force it is necessary to quote the whole of the last act, *chapter* 520, 20 *Del. Laws:*

"A supplement to an act entitled An act to incorporate the Wilmington and Brandywine Springs Railway Company, passed at

Opinion:—performance of condition of grant.

Dover, April 14, 1893,' and an act entitled 'A supplement to an act entitled An act to incorporate the Wilmington and Brandywine Springs Railway Company, passed at Dover, May 1, 189J, are hereby continued in full force, and shall not cease and be forfeited: provided that the railway authorized by such act to which this is a supplement shall be built and in operation on or before the first day of January, A. D. 1898, otherwise such act shall become void, and all rights, privileges and franchise therein granted shall wholly cease and determine."

It is admitted by the respondent that it has never built a railway "to the boundary line of the City of Wilmington on Union Street," but it claims that on or before the said 1st day of January, A. D. 1898, it did build and operate a railway to the boundary line of the city on Greenhill Avenue, which it claims was authorized by the first supplement to its charter, above cited, and that, therefore, this was a performance of the condition imposed.

The complainant also denies the building and operation to Greenhill Avenue in the time limited, claiming that the facts proved by the pleadings and affidavits show that the building and operation alleged were only a colorable pretense; and further contends that the act last cited requires the building and operation of a railway to the boundary line of the city on Union Street, and also of the extension into the City of Wilmington, which complainant is now seeking to enjoin; and that, therefore, even granting that the respondent did build and operate a railway to the point claimed on or before January 1, 1898, the building and operation to that point did not constitute a performance of the conditions imposed by the grant.

Although these contentions were all argued at great length, and with earnestness and vigor, yet·it was urged by respondent's counsel, with greatest insistence, that it was not competent for the complainant to raise these questions in this cause; that they must be determined first by *quo warranto* proceedings in the name of the State; and this is the question which I will now consider.

In the case of *Mayor, etc., vs. Addicks, ante p.* 310, 43 *Atl.* 297, *etc.*, this Court stated the general principles as follows: "In Thompson's Commentaries on the Law of Corpora-

tions, the general rule is laid down 'that when a corporation has an existence *de facto* the rightfulness of its existence can only be questioned by the State, and cannot be questioned collaterally in a litigation between it and a private party.' " 1 *Thomp. Corp. Sec.* 511, at least one hundred cases being cited in illustration and support. Judge Strong, subsequently one of the Justices of the United States Supreme Court, spoke to the same effect in *Cochran vs. Arnold*, 58 *Pa. St.* 405, saying: "If there is anything settled, it is that the corporate existence of a corporation *de facto* cannot be inquired into collaterally. Upon this subject the authorities are too numerous to admit of citation.' It is only by *quo warranto* proceedings in the name of the State that its right to exist can be determined.

"This is indisputable, and is not denied by counsel for complainants as a general proposition. The apparent exceptions—as in the cases where the aid of the courts is invoked by corporations seeking to condemn land or obtain certain other special rights—rest upon principles that in no way conflict with the general rule."

A case decided by this Court within the apparent exception referred to was that of *Williamson vs. Gordon Heights Ry. Co., ante, p.* 192, 40 *Atl.* 933, etc. In that case an injunction was granted restraining the respondent, an electric railway company, from entering, etc., upon complainant's land under condemnation proceedings, upon the ground that the respondent had forfeited or lost its right to condemn by reason of its failure to complete and operate, within the time limited in its charter, the branch line for the benefit of which the land was sought to be taken. The argument of counsel in that case was entirely upon the application to the branch line of the limitation as to time of construction contained in the original charter. The question of complainant's right to raise the question was not argued, it being apparently conceded by counsel, and therefore was not discussed in the opinion. but, as it never has been discussed by any of the Courts of this State, and has been thoroughly argued by counsel in this cause, it now becomes necessary to consider it

fully and to state clearly the principles and distinctions laid down by the American authorities upon which the decision in the Gordon Heights Railway Case was based, especially as the forfeiture clause in the Gordon Heights Railway Company charter was couched in the same language as that contained in the charter and supplement under consideration in this cause; so that the cases are in this respect parallel.

The general principle has been stated already, in the quotation from Mr. Thompson, "that when a corporation has an existence *de facto*, the rightfulness of its existence can only be questioned by the State, and cannot be questioned collaterally in litigation between it and a private party," and the apparent exception has been stated broadly and clearly by the same authority (5 *Thomp. Corp. sec.* 6587) in the following language: "The sound doctrine is that when a statute creating a corporation declares that, unless the corporation performs certain acts within a prescribed time, its corporate existence and privileges shall cease, or its powers and franchises shall terminate, the statute executes itself, so that, if the prescribed acts are not done within the prescribed time, the corporation *ipso facto* ceases to exist, without the necessity of any further action by the State, either by a legislative declaration of forfeiture or by a judgment of forfeiture in a judicial proceeding. In such a case, whether the corporation has lost its existence, is a fact *in pais*, which may be ascertained in any judicial proceeding, whether the question arises directly or collaterally, whenever its ascertainment becomes necessary for the protection of rights or the redress of wrongs."

The ground which supports the decision of the Courts so holding, and the mistakes which have been made by those Courts which have repudiated the doctrine, are disclosed in the following quotation from one of the early opinions of Chief Justice Marshall: "It has been proved that in all forfeitures accruing at common law, nothing vests in the government until some legal steps shall be taken for the protection of the right, after which, for many purposes, the doctrine of relation carries back the title to the commission of

the offense; but the distinction taken by counsel for the United States between forfeitures at common law and those accruing under a statute, is certainly a sound one. When the forfeiture is given by the statute, the rules of the common law may be dispensed with, and the thing forfeited may either vest immediately or on the performance of some particular act, as shall be the will of the legislature. This question depends upon the construction of the statute." *United States vs. Grundy*, 3 *Cranch*, 337–351, 2 *L. Ed.* 459. The reason why a forfeiture created by a statute is self-executing, while one raised by the common law is not, is that the Legislature said so, and intends so. In every case, the decision of the Court is based upon the precise language of the statute, and, after a very extensive examination of the authorities, I have been unable to find a single case in which the precise language used in the forfeiture clause under consideration, viz."such act shall become void, and all the rights, privileges and franchises therein granted shall wholly cease and determine," has been held not to be self-executing. The charter is held simply to expire in such cases (as in those with which we are so familiar in this State, where the duration of the charter is limited to twenty years,) and at the expiration of the time limited, the fact may be ascertained in a judicial proceeding whether the question arose directly or collaterally, *whenever ascertainment becomes necessary for the protection of rights or the prevention of wrongs.* When any language less explicit and clear than "shall cease and determine" is used, the weight of authority is in favor of the view that the statute does not undertake to decree a forfeiture, but only to prescribe the consequences which should flow from certain future acts and omissions on the part of the company, and that, therefore, the question whether a forfeiture of the charter of the company had occurred, could only be determined by proper proceedings on the part of the State.

The distinction is made in the case of *Day vs. Railroad Co.*, 107 *N. Y.* 129, 13 *N. E.* 765. The language of the forfeiture clause upon a failure to commence construction within the time prescribed by the charter was, "said corporation

shall be dissolved." The Court said (*page* 139, 107 *N. Y.*, and *page* 767, 13 *N. E.*): "In this State it is clear that under a similar statute, dissolution is not effected by a mere failure to perform the conditions, nor without judicial proceedings and judgment. The cases cited by the appellant (*In re Brooklyn W. N. & R. Co.*, 72 *N. Y.* 245, 75 *N. Y.* 335; *Brooklyn S. T. Co. vs. City of Brooklyn*, 78 *N. Y.* 525), are easily distinguished from the case at bar. The statute before the Court in those cases provided in express terms that, if the railroad company in question failed to finish its road within the time specified, 'its corporate existence and power shall cease.' It is held that the statute executed itself, and that the non-compliance with the condition extinguished the corporation in question by virtue of an express limitation upon the original grant of corporate power. But the general principle was recognized that, in the absence of such or like language, a corporation, by omitting to perform a duty imposed by its charter, or to comply with its provisions, does not *ipso facto* lose its corporate character." And the Court cites *Vermont & C. R. Co. vs. Vermont Cent. R. Co.*, 34 *Vt.* 2. I will also cite *Peavey vs. Railroad Co.*, 30 *Me.* 498, 500, where the company's right to condemn land was successfully contested after the time limited to construct had expired; and *Oakland R. Co. vs. Oakland, B. & F. R. Co.*, 45 *Cal.* 365, where the railroad was enjoined from constructing its road on a city street after the expiration of the time for construction, the words of the forfeiture clause being "the franchise shall utterly cease and be forfeited."

In the case of *In re Brooklyn W. & N. R. Co.*, *supra*, the land owner successfully challenged the right to condemn after the expiration of the time limited. And in *Brooklyn S. T. Co. vs. Brooklyn*, *supra*, the corporation was held to have forfeited its right to enter a city after the expiration of the time limited without construction. See, also, *New York, H. & N. R. Co. vs. Boston, H. & E. R. Co.*, 36 *Conn.* 196. But any further citation or discussion seems entirely unnecessary for the purpose of sustaining the view heretofore taken by this Court (*Williamson vs. Gordon Heights Ry.*

*Co., supra,*) of the effect of the forfeiture clause couched in the precise language of the one under consideration. It is sustained by reason and the overwhelming weight of authority, so that its correctness seems to be placed beyond a shadow of doubt, and what might be said by way of criticism of the position taken by some of the courts when interpreting other provisions somewhat similar does not concern us in the present cause.

As already stated, it was decided by this Court, in the case of *Williamson vs. Gordon Heights Railway Co., supra,* that a landowner whose land is sought to be taken by condemnation proceedings has a standing in this Court entitling him to raise the question; and it only remains to consider whether the complainant in this cause has such right, and is threatened with such special injury as to give it the necessary standing in a court of equity. In my judgment it has, provided it be held to have been granted by its charter the exclusive right, which it claims, of "locating, constructing and operating a city railway within the city limits." Such an exclusive right is a property right entitled to the same protection as any other property right. If it were not for the reserved power of revocation, it could not be deprived of such right except by condemnation proceedings.

The only right possessed by the respondent to enter the city with its railway, depended upon the legislative grant, which has been shown to be a valid grant in exercise of the power of revocation reserved to the Legislature. But, if all its rights and franchises have ceased and determined by reason of its failure to complete its line within the time limited, the grant to extend it within the city limits has also ceased and determined. The complainant, therefore, has the same standing in this Court to raise the question of forfeiture of charter by reason of the respondent's failure to build and operate its original line within the time limited, as would the landowner whose land it seeks to condemn. I will here cite *Gaslight Co. vs. Green,* 46 *N. J. Eq.* 123, 18 *Atl.* 844, and the cases there cited, although I must state that in making the citation I desire to disclaim any intention of adopting the

extension of the principle to corporations not possessing exclusive rights, which is undoubtedly held in some of the cases there cited.

It is, of course, well understood to be elementary law that a court of equity has no power to decree the forfeiture of a charter, even at the suit of the Attorney General, nor has the complainant, the Wilmington City Railway Company, any standing whatever to interfere with the building or operation of the respondent's railway outside of the city limits, whether its franchise be exclusive or not within the city limits; but on the ground that all the respondent's corporate rights and franchises have ceased and determined, complainant can ask a court of equity for an injunction to restrain it from entering the city, provided, of course, it be held to possess such exclusive franchise, and a decree of this Court, granting such an injunction, would have that effect, and no other.

It now becomes necessary to consider the crucial question of the exclusiveness of complainant's franchise within the city limits. Undoubtedly, the policy of the law is strongly against all grants of exclusive rights or monopolies, and they are construed by the courts with the greatest strictness. The rule of construction, as stated by respondent's counsel, is: "Nothing passes by implication; and if, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given it, those doubts are to be solved in favor of the State; and, where it is susceptible of two meanings, the one restricting and the other extending the powers of the corporation, that construction is to be adopted which works the least harm to the state." *Stein vs. Supply Co.*, 141 U. S. 68, 80, 11 *Sup*. *Ct*. 892, 35 *L. Ed*. 622.

Applying this rule of construction to the complainant's charter, which has been quoted in full above, so far as applicable to the question of exclusive right, let us see if any doubt or ambiguity can be found fairly to exist. In section 7 it provides: "The said corporation shall have the exclusive right and privilege of locating, constructing, operating and maintaining a city railway within the city limits." Language

could not be devised more clear and explicit than this. So that, if doubt there be, it must be caused by some other provision. Let us consider those which are suggested by respondent's counsel. First. The next sentence is, "The said railway shall commence near the depot of the Philadelphia, Wilmington & Baltimore Railroad Company, and thence shall extend to the intersection of Front Street and Market Street," etc., prescribing a route. Can any ingenuity extract from this description of the route a construction limiting the exclusiveness of the right to build a city railway within the city limits? To my mind, these two clauses, taken together, can be fairly construed into no other meaning than that, on the one hand, a monopoly to build within the city was granted, but on the other, the right to build was limited to the route indicated. No one else can build anywhere within the city, and the corporation complainant could build only on the route indicated. Next, in section 8, was granted a privilege to build anywhere within the city, subject, however, to the condition of first obtaining the consent of the Council of the City, and with respect to any railways to be constructed under section 8, the same rights and privileges were conferred as existed with respect to the first described railway. The corporation was first granted the exclusive privilege within the city limits absolutely and explicitly. Afterwards the railways which it might construct, and the conditions under which they were to be constructed, were set forth.

Strictness of construction does not mean disingenuousness or word playing on the part of a court in order to limit a meaning which it may consider improvident or against public policy; and on a fair reading I am unable to find in this language a reasonable doubt that the above is its plain, obvious meaning, or to believe that it is susceptible of another meaning restricting the powers of the corporation. And it may not be amiss to remark in this connection that the most serious objections to grants of monopolies disappear when accompanied, as I think I have shown to be the case in this State, by the power reserved to the Legislature under the Constitution of 1831 to

revoke the monopoly feature of their grants without affecting any other rights or franchises that may have been granted, and under the present Constitution, the Courts have yet to determine what effect the general corporation act lately enacted will have upon the exclusive rights contained in special charters granted under the Constitution of 1831 by reason of the organization of corporations in accordance with the provision of the general corporation act, possessing powers inconsistent with such exclusive rights.*

The other contention of respondent's counsel on this point is, that the grant of exclusive right to the Wilmington City Railway Company cannot operate to exclude another city railway from operating an electric railway within the city limits, because electricity was not used as a motive power at the time the charter was granted. A great number of cases have been cited by counsel on both sides in this connection, which I have examined with the greatest care, and, were it not for the length to which this opinion necessarily extends on account of the number and difficulty of the questions involved, I would review them, although none of them are precisely in point; the one chiefly relied upon by respondent being *Omaha Horse Ry. Co. vs. Cable Tramway Co. of Omaha (C. C.)* 30 *Fed.* 324. In that case, complainant's charter granted the exclusive right to operate a "horse railway" within the city of Omaha, and it sought to enjoin the respondent, who was subsequently empowered to operate a "cable tramway," and the injunction was refused, it being held very properly that an exclusive right to operate a horse railway could not operate to exclude a cable tramway. The principles of construction applicable to corporate grants would plainly forbid the enlargement of the grant beyond the strict meaning of the words. The learned judge, in delivering the opinion, however, said, by way of suggestion: "If the Legislature had used the words 'street railway' instead of the words 'horse railway,' a very pertinent question would arise whether

*See *Wilmington City Ry. Co. vs. Peoples Ry. Co.* to be reported in the next succeeding volume of these reports, in which the question here suggested was considered and decided.

it intended to grant an exclusive right to any other than that form of street railway, to wit, horse railway, with which it was familiar." And counsel for respondent in their brief quote further from the opinion: "We are bound to assume that the Legislature is dealing with the known, and not with the unknown, and that, when it grants a franchise, it only intends to grant that of which it has knowledge; and it is unreasonable to lay stress on the form of language, or the words used for the sake of broadening the intent so as to include things not then known." This argument seems like reversing the universal canon of construction that it is to the words actually used we must look. It would seem that when the broad term "city railway" is used, the term must be taken to mean only what is essential to the definition of the term, and obviously no particular motive power is essential. Whenever a statute specifies the motive power to be used, the expression of that power may be construed to exclude any other. The general rules of construction require this. But, when an exclusive right is given in general terms to a city railway, the effort to confine it to the particular motive powers in use at the time would seem to be as artificial and unauthorized as to confine it to the kind of rails then in use, excluding the idea of modern rails of steel and of great weight, or to limit the size and shape and quality of cars to those known at the time. All these things, including the motive power, are subordinate,—mere means to make the franchise effective; and yet the expression of any of them might be so made as to limit the grant. When no kind of motive power is mentioned, it should be taken to indicate that the Legislature means what it says, "a city railway," however propelled, whether by powers then familiar, or those they know not of; in fact, any kind of power which the ingenuity of man may contrive that does not constitute an additional burden upon the highway, or an injury and annoyance to the public. Although no case has been cited which is clearly analogous, the great majority of them adopt a line of reasoning in general accord with this view, and I will cite the following: *Hudson River Tel. Co. vs. Watervliet T. & R. Co.*, 135 *N. Y.* 393, 32 *N. E.* 148; *Rail-*

*way Co. vs. Mills*, 85 *Mich.* 634, 48 *N. W.* 1007; *North Bla-timore Pass. Ry. Co. vs. North Ave. Ry. Co.*, 75 *Md.* 233, 23 *Atl.* 466.

Respondent's counsel also cite the proviso in section 7, "that steam power shall not be used to propel the cars of said company unless with the consent of city council, and that, in order to prevent accidents, suitable bells shall be attached to the horses drawing the cars," and argue that it shows that the motive power was intended to be limited to steam or horses. Taking this proviso in connection with the general terms of the grant, would it not rather indicate that, omitting mention of motive power in the grant, and afterwards regulating the use of the two powers with the use of which they were practically familiar, the Legislature left all other possible powers to be treated as experience might prove to be desirable?

In view of all these considerations, I am led to the conclusion that the complainant does possess, under its charter, the exclusive right and privilege of locating, constructing, operating, and maintaining a city railway within the city limits, and therefore has the standing in this Court necessary to enable it to raise, by its bill for an injunction, the question whether respondent's right to extend its railway within the city limits has ceased and determined, in consequence of its failure to build and operate as required by its charter and the supplements thereto, thereby incurring a forfeiture of all its privileges and franchises,—a forfeiture which has been shown to be self-operating. The other grounds upon which complainant asserts its exclusive right, are unnecessary to consider, and it only remains to ascertain whether the respondent has built and operated its railway as required by its charter and the supplements thereto within the time limited therein.

As stated above, the respondent only claims to have built and operated a railway to the boundary line of the City of Wilmington on Greenhill Avenue, and admits that it has not built and operated its railway to the boundary line of the City on Union Street, as was required in its original charter.

It is denied by the complainant, that the railway to the city line on Greenhill Avenue was built and operated within the time limited, but, without considering this disputed question of fact, I shall proceed to inquire whether, granting that to have been done as claimed by the respondent, it was such a performance of the condition imposed as would avoid a forfeiture. To determine this, it is only necessary to examine the provisions of the charter and the supplements, which have been fully quoted above. By a simple inspection of these acts it appears: First, that the terminus of the line fixed by the charter is the boundary line of the City of Wilmington on Union Street; second, that the extension provided for in the supplement is made to depend upon the building and operation by the corporation complainant of "its line"; and finally, that the forfeiture clause in the last supplement requires that "the railway authorized by such act" shall be built and in operation on or before the 1st day of January, A. D. 1898. Now, whatever may be "the act" referred to in the last supplement, it is obvious that no railway authorized by any of the acts mentioned is even claimed to have been built and in operation, unless the language used in the first supplement can be construed to have altered the terminus of the line prescribed by the charter, viz. "the boundary line of the City of Wilmington at Union Street." It is manifest that it cannot be so construed. It is true that if, obeying the language of its charter and first supplement, the respondent had completely built and constructed its line to the boundary of the city on Union Street, beginning its construction at Brandywine Springs, and building towards Wilmington, and should then build and extend its railway from the point at which such railway intersects the boundary line of the city,—i. e. at Union Street,—it appears from the map filed as an exhibit and the affidavits, that it would build a line with an acute angle in it. But surely, no one could seriously contend that such a practical disadvantage in the route prescribed would justify a court in so violating the plain language of a corporate grant as to hold that the corporation could build its line so as to avoid a terminus which would make an undesirable angle

with an extension. and yet comply with the terms of its charter. However harsh the consequences of this construction may be, it is absolutely clear to my mind that it is the only one, of which the acts in question are susceptible; and when termini are fixed and a location prescribed for a railway,there can be no deviation from the route required. Such conditions are of a kind that excludes them from that class of requirements held to be susceptible of "substantial performance." The reasons are too obvious to require statement. It therefore follows that, the respondent having failed to build and operate the railway authorized by such act on or before the 1st day of January, 1898, its right to extend its line into the City of Wilmington has wholly ceased and determined.

A number of other questions have been raised by counsel, which have been ably presented in the many voluminous briefs submitted in this cause, and I have found it necessary to examine some of them as carefully as those I have discussed. It is entirely unnecessary, however, to consider them now, in view of the conclusions which I have reached upon the grounds stated, and a discussion of them would only prolong the opinion without subserving any useful purpose.

The only fact in the cause which I have not yet mentioned and commented upon, is that of the contract or traffic agreement between the respondent, the Brandywine Springs Railway Company, and the complainant, the Wilmington City Railway Company, executed on the 10th of May, 1898. This agreement was made to continue for a period of twenty-five years, and contained a stipulation on the part of the Brandywine Springs Railway Company that during that time it would not attempt to extend its tracks into or within the present limits of the City of Wilmington; and one of the grounds upon which complainant based its prayer for relief was to restrain the respondent from violating this stipulation. The respondent's contention in reply to this was that the stipulation was *ultra vires*, and also against public policy, as being in restraint of competition; and in this contention it is undoubtedly correct.

It is well settled that a corporation has no power to deprive itself by contract of a franchise accompanied by a public duty, such as the construction and operation of a railway, without express legislative sanction, and this the Brandywine Springs Railway did not possess; for, although its original charter gave it the right to make a traffic agreement with the Wilmington City Railway, the grant of the franchise to extend its line within the City of Wilmington was subsequent to that, and therefore could not be held to be included within the right. It is also well settled that a court of equity would not enforce a stipulation of this character by injunction. The respondent based upon this contract the claim that by it complainant was estopped to deny the corporate existence of the Brandywine Springs Railway Company. In regard to this contention it is only necessary to state that there could be no estoppel except as to matters arising out of the contract.

Although the case has been argued on a motion for a preliminary injunction, it could not have been discussed more thoroughly at a final hearing, and I have deemed it necessary to treat the questions raised with the same thoroughness, because the reasons upon which I decide the motion for a preliminary injunction are the same as would control my decision in making a final decree. The motion for a preliminary injunction is granted.

Let the order be entered accordingly.